Kuroske, Respondent, vs. Ætna Life Insurance Company, Appellant.

*March 14—April 9, 1940.*

For the appellant there were briefs by *Quarles, Spence & Quarles,* attorneys, and *Kenneth P. Grubb* of counsel, all of Milwaukee, and oral argument by *Mr. Grubb.*

For the respondent there was a brief by *Vernon J. Mc-Hale,* attorney, and *D. W. Goodnough* of counsel, both of Antigo, and oral argument by *Mr. McHale.*

NELSON, J.   The policy in question was a so-called "special automobile accident policy," under the terms of which the liability of the defendant was limited.   The policy provided, in part, as follows:

"The insurance under this policy shall not cover accident, injury, death, disability or other loss caused directly or indirectly, wholly or partly, (1) by disease in any form, (2) by gas poisoning or asphyxiation, or (3) by war or any act of war; or sustained by the insured . . . (7) while under the influence of any intoxicant or narcotic."

The policy was issued in this state and must be construed as a Wisconsin contract.   In *Bakalars v. Continental Casualty Co.* 141 Wis. 43, 47, 122 N. W. 721, the language: "Under the influence of any intoxicant," was construed.   It was there said:

"We must presume that it means such and so much influence as impairs the ability of the subject to care for himself and thus increases the probability of his suffering accidental injury.   In light of such reasoning it has been decided by all courts speaking upon the subject that influence of intoxicants in accident policies means the same thing as the word 'intoxication.' "   (Citing cases.)

The trial court instructed the jury as to the meaning of the language "under the influence of any intoxicant," as declared by this court in the *Bakalars Case, supra,* and the jury found that the deceased, at the time of the accident, was not under the influence of any intoxicants.

The defendant assigns as error, (1) the refusal of the trial court to change the answer of the jury, (2) the denial of its motion for judgment notwithstanding the verdict, and (3) the denial of its motion for a new trial.

The broad contention made by the defendant is that the evidence does not support the. verdict. Before considering the more specific contentions of the defendant it will be helpful to summarize the facts.

The injured, at the time of his death, was forty-two years of age. He operated a tavern at Sayner. He had served as a bartender in prior years. During the winter preceding February 23, 1938, he had been drinking more or less heavily. From February 23d to March 2d, he was treated at the Rhinelander hospital for chronic alcoholism. On November 14, 1938, he drove from Sayner to Rhinelander, arriving there at his mother's home at about 10 o'clock p. m. At about 11 o'clock he and his brother Leo drove to Deau's Tavern in Rhinelander. They were there about forty minutes. They then drove to Langdon's Tavern where they remained until about ten minutes to one. They then drove to Khoury's Club, another tavern located about two miles from Rhinelander. They stayed there until a little after 3 o'clock. They left that tavern intending to go to a tavern in Rhinelander, known as the "Hungry Hole," where the deceased wished to get some pea soup. Enroute to the "Hungry Hole," and within the city of Rhinelander, the accident occurred. Just prior to the collision, the train was being operated at a speed of about ten miles per hour and the automobile at thirty to forty miles per hour. The automobile collided with the left side of the pilot of the locomotive. The train was so quickly stopped that the dragged automobile was still within the street limits. Both the deceased and his brother were severely injured. Within a comparatively short time they were taken by ambulance to the Rhinelander hospital. After being released from his automobile the deceased had walked to the ambulance with the assistance of the ambulance driver. He sat on the seat with the driver until the hospital was reached. His brother Leo was first cared for at the hospital because he was bleeding. The deceased

was then cared for. His chest was severely injured and he was in great shock and pain. Pursuant to the request of a state traffic officer, Dr. Richards, the attending physician, took a sample of deceased's blood. The deceased died the following day, November 16th.

Testimony was adduced by the defendant to show that the sample of blood taken by Dr. Richards was, after several days, delivered to Goodwin Jost, of Minneapolis, a commercial chemist, for analysis. Mr. Jost testified that he analyzed the sample delivered to him and found that it contained .25 per cent of ethyl alcohol by weight. Drs. H. A. Heise and E. L. Tharinger, both of Milwaukee, who testified as experts, stated their opinions as to the various degrees of intoxication that exist in individuals having different percentages of alcohol in their blood. Both of them related experiments conducted by them and by other scientists, based on chemical tests to determine intoxication. They testified in substance that they were not able to say that individuals having .05 per cent of alcohol in their blood are under the influence of alcohol; that some individuals having .05 per cent to .15 per cent of alcohol in their blood are definitely in the range of alcoholic effects; that individuals having .15 per cent or more of alcohol in their blood are not borderline cases and are definitely under the influence of alcohol, and that individuals having .25 per cent of alcohol in their blood are intoxicated.

The plaintiff produced a number of lay witnesses who testified as to the limited number of drinks that they had observed the deceased take during the late hours of November 14th and the early hours of November 15th, while he was in the taverns mentioned, and as to his nonintoxicated condition at the time he left the Khoury Club shortly before the accident.

It is contended that the testimony adduced by the plaintiff was negative in character under the rule stated in *Zenner v.*

*Chicago, St. P., M. & O. R. Co.* 219 Wis. 124, 262 N. W. 581, and numerous cases cited therein, and that such testimony therefore did not create a jury question. Leo Kuroske testified that he saw the deceased drink only two beers and that he did not see him take any other drinks. His testimony as to the two beers was of course positive. Carl Larson, who was tending bar at Deau's Tavern on the evening of November 14th, testified that he did not see any signs of intoxication on the deceased when the latter was in that tavern. This testimony was of little or no materiality on the question of the deceased's intoxication about four hours later. Mrs. Khoury, the wife of the proprietor of the Khoury Club, testified that the deceased arrived at the Khoury Club between 1 and 2 o'clock and stayed there about two hours; that when he first came in he had a bowl of chili; that she did not see him drink anything; that she talked to him and observed no signs of intoxication on him; that the deceased talked mostly to her husband; that she participated in the conversation off and on; that the deceased evidenced no signs of mental confusion or intoxication; that she and one waitress waited on the tables and booths and served both drinks and food, and that during the hours mentioned she was in conversation with the deceased quite a bit of the time. Anton Khoury, the proprietor, testified that he was well acquainted with the deceased; that the deceased had worked for him; that he talked to the deceased much of the time during the two hours; that the deceased was not drunk; that he could observe no signs of intoxication on him and could smell no liquor on his breath; that in discussing a business matter with him, the deceased made no remark that seemed unreasonable; that he himself had not taken a drink within twenty-four hours prior to the time that the deceased was in his place; that he might have left the room for a few seconds ten or fifteen times while the deceased was there. The witness admitted that the deceased might have had drinks which he had not observed. Albert Onson, the driver of the ambu-

lance, testified that he did not notice any signs of intoxication, but also stated that he had made no observations at all to determine whether the deceased was sober, because he was not interested. Dr. Richards testified that he did not observe any signs of intoxication on the deceased; that he did not observe any lack of exercise of mental functions on his part; that the deceased answered questions intelligently and understood what was said to him; that in suturing the wound on the deceased's chin it was necessary that his face be in close proximity to that of the deceased; that at that time he did not notice any intoxication on the deceased.

Dennis Deau, a brother-in-law, testified that he saw the deceased in the hospital at about five-twenty in the morning and talked to him at that time. He testified that the deceased did not appear to have been drinking, but that he paid no particular attention to inquire as to whether Edward had been drinking. On cross-examination he admitted that he hadn't given any thought to the question whether Edward had been drinking. He was not interested.

While much of the testimony of Leo Kuroske, Albert Onson, Dennis Deau, and Carl Larson was negative, the testimony given by Dr. Richards, Mr. Khoury, and Mrs. Khoury was positive. Its credibility was therefore for the jury.

The defendant next contends that the sample of blood taken by Dr. Richards, its alcoholic content as revealed by the chemical analysis, and the opinions of Drs. Heise and Tharinger, constituted physical or scientific facts which should be given the same controlling effect that has often been accorded to undisputed physical facts by this court. *Badger v. Janesville Cotton Mills,* 95 Wis. 599, 70 N. W. 687; *Marshall v. Green Bay & W. R. Co.* 125 Wis. 96, 103 N. W. 249; *Bergner v. Chicago & N. W. R. Co.* 221 Wis. 606, 267 N. W. 288; *Covnot v. Clayton,* 227 Wis. 144, 277 N. W. 122; *Waterman v. Heinemann Bros. Co.* 229 Wis. 209, 282 N. W. 29; *Duame v. Feltus,* 229 Wis. 655, 283

N. W. 299; *Hunter v. Sirianni Candy Co.* 233 Wis. 130, 288 N. W. 766; *Schulz v. General Casualty Co.* 233 Wis. 118, 288 N. W. 803. In our opinion, the contention of the defendant is much too broad. The sample of blood taken from the deceased was, of course, a physical fact. Its alcoholic content, if accurately shown, was a physical fact. The opinions of Drs. Heise and Tharinger, however, were obviously expert testimony, and its weight, as such, was clearly for the jury. It is generally recognized that the relative weight and sufficiency of expert and opinion testimony is peculiarly within the province of the jury to decide, and that the same tests commonly applied in the evaluation of ordinary evidence are to be used in judging the weight and sufficiency of expert testimony. See 20 Am. Jur. p. 1056, § 1206. So we conclude that the evidence adduced by the plaintiff did give rise to a jury question, and that it may not be said that the verdict of the jury is without support in the evidence.

It may not be amiss to note here a contention of the plaintiff, the substance of which is, that opinions based upon percentages of alcohol in the blood, and tests conducted for the purpose of determining degrees of intoxication, are not sufficiently certain and accurate to make such opinions or deductions at all conclusive, because of certain individuals' toleration to alcohol. The plaintiff concedes that much is being accomplished by those engaged in making tests for intoxication, but that such tests, based upon the alcoholic content of the blood, the urine or other body fluids, are as yet in an experimental stage. The plaintiff does not contend that such expert testimony was not admissible in evidence for the reasons stated by this court in *State v. Bohner,* 210 Wis. 651, 246 N. W. 314, regarding blood-pressure deception tests, commonly known as the "lie detector." From the testimony of Drs. Heise and Tharinger, and from numerous reports and articles that may be found in recent law reviews, medical, and medicolegal journals, we are of the opinion that such

evidence, if properly obtained, should be admitted. See particularly, 23 Iowa Law Rev. 57, and 24 Iowa Law Rev. 191. We have found but one case decided by a court of last resort which dealt with similar evidence. *State v. Duguid*, 50 Ariz. 276, 72 Pac. (2d) 435. In that case the defendant was charged with having driven an automobile upon a public highway while under the influence of intoxicating liquor. Expert testimony based on a urine analysis for alcohol was held to be admissible in evidence. It was, however, not intimated in that case that such evidence was conclusive. It may, of course, well be that in the none-too-distant future experimentation along such lines will be sufficiently advanced so that specimens of blood which are found to contain certain percentages of alcohol may be almost conclusive on the question of intoxication in cases where the samples have been properly taken, properly safeguarded, accurately analyzed by competent, disinterested, impartial, and dependable chemists, and properly identified. Two states have enacted statutes specifically authorizing courts to admit such evidence and declaring the effect thereof. In 1939 Indiana passed such a statute. Ch. 48, art. V, sec. 54 (2), Acts of 1939. That statute, in part, provides:

"Such evidence may be accompanied by other relevant evidence such as eyewitness testimony about defendant's appearance, speech and conduct at the time alleged. Evidence that there was, at that time, five-hundredths per cent, or less, by weight of alcohol in his blood, is *prima facie* evidence that the defendant was not under the influence of intoxicating liquor sufficiently to lessen his driving ability within the meaning of the statutory definitions of the offenses. Evidence that there was, at the time, from five-hundredths per cent to fifteen-hundredths per cent by weight of alcohol in his blood is relevant evidence but is not to be given *prima facie* effect in indicating whether or not the defendant was under the influence of intoxicating liquor within the meaning of this act. Evidence that there was, at the time, fifteen-hundredths per cent, or more, by weight of alcohol in his blood, is *prima facie* evidence that the defendant was under

the influence of intoxicating liquor sufficiently to lessen his driving ability within the meaning of the statutory definitions of the offenses."

A similar statute was enacted by Maine during the same year. Ch. 273, Laws of 1939.

While in our opinion such statutes are not necessary to render such evidence admissible in actions involving issues of intoxication, such statutes show definite trends toward the recognition of such tests and the effect that should be given to such evidence.

Numerous cases may be found which hold, in substance, that no particular scientific knowledge is required to recognize whether a person is in a drunken or intoxicated condition, and that a lay witness, who has the opportunity to observe the facts upon which he bases his opinion, may give his opinion whether a person at a particular time was or was not intoxicated. 20 Am. Jur. p. 736, § 876.

It may be noted that the sample of blood taken by Dr. Richards passed through so many hands before it was delivered to Mr. Jost, that the jury may not unreasonably have entertained some doubt whether its integrity as a sample had been preserved. Those facts will be detailed in connection with the next contention of the defendant.

The defendant next contends that the court erred in denying its motion for a new trial because of its rejection of certain evidence. At the time the deceased and his brother, Leo, were in the hospital, a sample of Leo's blood was also taken. Dr. Richards wrote an identifying memorandum for each sample and wrapped it around the test tube containing the blood. The two samples were taken by Dr. Richards to his office where he turned them over to a Miss Miller, his office girl, with instructions to turn them over to the traffic officer. The tubes were placed by Miss Miller on a test-tube rack in the laboratory. The test tubes were not

sealed. They were turned over to an officer who kept them in the pocket of his automobile for about two days. The samples were then turned over to an adjuster for the Soo Line, who wrapped them in a package and sent them by "company mail" to the general claim agent at Minneapolis. The baggageman who had charge of the company mail from Rhinelander to Minneapolis was not produced as a witness. The package, however, was sealed with adhesive strips of paper. The package was opened in the office of the general claim agent by a stenographer who broke the seals. At the request of the general claim agent, the stenographer took the samples to Mr. Jost, the chemist. The cross-examinations of the defendant's witnesses who traced the sample of blood from Dr. Richards' office to Mr. Jost revealed a studied attempt to cast suspicion upon the integrity of the sample analyzed by Mr. Jost. Near the conclusion of its case, the defendant recalled Mr. Jost and sought to elicit. testimony as to the alcoholic content of the other sample, presumably that of Leo. To such evidence the court sustained an objection. At the time the deceased and Leo left the Khoury Club, the latter was concededly intoxicated, having been in a drunken sleep for about twenty minutes in the deceased's automobile. The defendant doubtless desired to show that the other sample contained a greater percentage of alcohol than the one identified as that taken from the deceased. We think the evidence was not material on the question of the deceased's intoxication and, in any event, its rejection was not prejudicial.

The defendant further contends that the court erred in refusing to give the following requested instructions:

"You are further instructed that if you believe that credible scientific evidence and tests showed the presence of alcoholic liquor in the blood of the deceased, Edward Kuroske, of sufficient quantity to cause said Kuroske to be under the influence of intoxicating beverages, *such tests are entitled to*

*a greater weight than mere opinions or conclusions of witnesses not based upon scientific tests and knowledge. If* you believe from the evidence in this case that accurate scientific tests showed that at the time of the accident in question Edward Kuroske had such quantities of alcohol in his blood that he was under the influence of intoxicants, you will answer this question in the verdict, Yes. Notwithstanding that there is testimony of witnesses who did not make scientific tests or examinations that they did not observe that said Kuroske was intoxicated. . . .

"You are further instructed *that the opinion of* [an] *ordinary untrained observer based on no accurate tests is not entitled to the same weight as accurate credible scientific tests* in determining what the fact was as to the condition of Edward Kuroske."

Defendant claims that the instructions were proper and should have been given. *Duame v. Feltus, supra; Heckel v. Standard Gateway Theater,* 229 Wis. 80, 281 N. W. 640. Those cases do not support the defendant's contention. No other cases are cited to show that such instructions were proper. In our opinion, the requested instructions improperly gave controlling effect or weight to the opinions of the experts. See 20 Am. Jur. pp. 1059–1061, § 1208, where the law as to the conclusive or controlling effect of expert testimony is fully stated.

We therefore conclude that the evidence adduced by the plaintiff was sufficient to raise a jury question; that the opinions of the experts were properly received in evidence; that the weight of the testimony of the lay witnesses bearing upon the question of intoxication of the deceased shortly before he left the Khoury Club was for the jury; that the opinions of the experts were not conclusive and the weight to be given them was for the jury.

*By the Court.*—Judgment affirmed.