300 P.2d 642

Dale M. FRETZ, Plaintiff and Respondent,

v.

Ray ANDERSON, as Administrator of the Estate of Mack F. Anderson, Deceased, and Ringsby Truck Lines, Inc., and Adam Lehl, Defendants and Appellants.

No. 8334.

Supreme Court of Utah.

Aug. 16, 1956.

Rich & Strong, Salt Lake City, for appellant.

Richard W. Brann, Ogden, for respondent.

## McDONOUGH, Chief Justice.

Appeal from a judgment on a verdict for plaintiff for $10,000.00 general damages and $1,135.90 special damages arising out of an automobile collision against the estate of the deceased, who was killed in that accident or immediately prior thereto.

The overturned automobile of the deceased was observed on the east half of a paved road at about 2:30 a. m. by a driver for Ringsby Truck Lines, who was traveling south on the west half of the pavement. He slowed his semitrailer and stopped it a short distance beyond the wreck and parked partly on the west shoulder. While he was preparing to set out flares to warn other drivers, plaintiff, driving north, smashed into the damaged car on the highway, turning it completely about and pushing it approximately 30 feet north of its former position. Investigation after the accident revealed skid marks laid down by plaintiff's car for about ten feet before the impact and plaintiff testified that she could not see the automobile in the road because she was temporarily blinded by the lights of the truck on the opposite side, and that she slowed down on approaching it and applied her brakes hard after passing the truck. Blood was extracted from the deceased and tested for alcohol content, and the doctor who made the chemical analysis testified that the deceased was "intoxicated to the extent of confusion." The state trooper who investigated the accident testified that he took four or more whiskey and wine bottles, three of which were broken, from the deceased's automobile and that he determined from skid marks that the automobile traveling south left the highway 300 feet north of the collision, went onto the shoulder on the east side of the highway, then returned westward to the highway and overturned at the point of collision. One of the tires on the Anderson car was mutilated and the rim was damaged, indicating the automobile had been run while the tire was flat.

Appellant relies on six points for reversal, including alleged errors in admission of evidence and in giving instructions, and declares that there was a failure of proof of the deceased's negligence proximately causing the accident; that plaintiff was guilty of contributory negligence, and that damages awarded are excessive.

This is the first case brought to this court under U.C.A.1953, 78–11–12, providing for the survival of certain tort actions:

"Causes of action arising out of physical injury to the person or death, caused by the wrongful act or negligence of another, shall not abate upon the death of the wrongdoer, and the

injured person or the personal representatives or heirs of one meeting death, as above stated, shall have a cause of action against the personal representatives of the wrongdoer; provided, however, that the injured person or the personal representatives or heirs of one meeting death shall not recover judgment except upon some competent satisfactory evidence other than the testimony of said injured person."

 Thus, the questions raised, although not new to our law, present considerations beyond those normal to a situation where the defendant, as driver of an automobile, is alive and testifies in his own behalf. For example, respondent cites a number of Utah cases holding that there is a presumption of negligence where the defendant encroaches on the portion of the street reserved for traffic from the opposite direction. Clearly, such a presumption is inapplicable to cases such as this, where the defendant is unable to rebut the presumption, even though the driver of the automobile had he lived, might have been able to produce evidence to show that he was not negligent.

 We agree that one whose negligent or unlawful act causes an obstruction in a highway is liable for injury occasioned thereby, but it is not negligence to permit a *disabled* vehicle to stand in the highway under circumstances which makes its removal impossible. Crawford v. Miller, 163

Kan. 718, 186 P.2d 116. Likewise, we cannot charge the operator of the overturned automobile with the duties of providing lights for the protection of other vehicles on the highway, U.C.A.1953, 41-6-129, when all of the evidence points to the fact that he was unconscious, seriously injured, or dead immediately after his car came to rest. MacDonald v. Appleyard, 94 N.H. 362, 53 A.2d 434. Therefore, the issue of negligence in the present case only relates to whether the disablement of the vehicle struck by plaintiff occurred as a result of the operator's negligence. Keller v. Breneman, 153 Wash. 208, 279 P. 588, 67 A.L.R. 92.

Appellant argues that the court erred in admitting the testimony of Dr. Freeman, who aided in the extraction of blood from the deceased and conducted chemical tests upon it for the determination of the alcohol content. He testified that the analysis disclosed a "0.268 per cent by weight of alcohol in the specimen," which, in his opinion, indicated that the deceased "was intoxicated to the extent of confusion." Under U.C.A. 1953, 41-6-44, which provides for criminal prosecution for driving while intoxicated, it is presumed that the defendant was under the influence of intoxicating liquor if there was 0.15 per cent or more by weight of alcohol in the defendant's blood.

There was no question of identity of the blood sample, for Dr. Freeman had the specimen in his control from the time that

it was extracted and testified as to the methods of his analysis. Appellant emphasizes a few discrepancies in the doctor's testimony which were brought out on cross examination; the jury apparently believed that the doctor's confusion was due to his lack of experience in testifying and accepted his candid corrections of misstatements. We cannot see how such matters go to the admissibility of the evidence.

Appellant cites to us no authorities to substantiate his apparent position in arguing that the deceased's parents did not consent to the taking of the blood sample; nor can be determine whether by such argument he is concerned with the constitutionality of the use of such evidence or the violation of some property interest in the dead body. The latter question, of course, would not be determinable of the admissibility of the evidence in a suit against the estate, even though the extraction of a quantity of blood from the body might, under some reasoning, be the basis of a separate law suit. It would appear that most of the cases treating the use of analyses of body fluids as evidence in the field of constitutional law are criminal cases dealing with unreasonable search and seizure or the privilege of the accused against self-incrimination. See 25 A.L.R.2d 1407; State v. Cram, 176 Or. 283, 160 P.2d 283, 164 A.L.R. 952, 967. In civil cases, the right of privacy or the inviolability of the person is the interest sought to be preserved and in some instances, the courts have held that an order for a physical examination violates the party's constitutional rights, Metropolitan Life Ins. Co. v. Evans, 183 Miss. 859, 184 So. 426; Haynes v. Haynes, Sup., 43 N.Y.S.2d 315; contra, Countee v. United States, 7 Cir., 1940, 112 F.2d 447, holding Rule 35(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. to be constitutional.

Only one case, Bednarik v. Bednarik, 18 N.J.Misc. 633, 16 A.2d 80, comes to our attention as holding that an order requiring a blood test was an infringement of the right of privacy, and this case was overruled in Cortese v. Cortese, 10 N.J. Super. 152, 76 A.2d 717. However, the determination of the question is unnecessary here, for the right of privacy is a personal one which in the absence of statute, dies with the person to whom it is of value and cannot be claimed by his estate or next-of-kin. The blood test of the decedent was admissible in a suit against his estate. Kuroske v. Aetna Life Insurance Co., 234 Wis. 394, 291 N.W. 384, 127 A.L.R. 1505; Lawrence v. City of Los Angeles, 53 Cal. App.2d 6, 127 P.2d 931.

The witness, Frampton, the admission of whose testimony appellant also cites as error on the part of the trial court, testified that he observed a 1939 Chevrolet (the make and model of the deceased's automobile) traveling south out of Scipio. For some reason not specified in the rec-

ord, he attempted to catch the automobile but was unable to do so, although he drove in excess of sixty miles per hour. He admitted that his only means of identifying the automobile was that 1939 Chevrolets have taillights placed peculiarly high on the rear of the vehicles. He could not testify positively that the automobile which he saw speeding was the same one as he later observed overturned in the road. Certainly, this evidence is weak, and cross-examination emphasized its weakness for the scrutiny of the jury, but should it have been excluded as having no probative value whatsoever? The cases on this point are very few, perhaps, for the reason suggested in 2 Wigmore on Evidence, Sec. 412, that if the circumstance of identity has no real probative value, no harm will be done; while if it has such value in combination with other facts, good evidence may be excluded by passing upon it piecemeal. Professor Wigmore suggests as a test of admissibility of circumstantial evidence of identification:

"A mark common to two supposed objects is receivable to show them to be identical whenever the mark does not in human experience occur with so many objects that the chances of the two supposed objects are too small to be appreciable. But it must be understood that this test applies to the total combination of circumstances offered as a mark, and not to any one circumstance going with others to make it up."

In the present case, circumstances narrowing the probability of the automobile seen by Frampton being the same as the one involved in the accident include the early hour of the morning, the car traveling in the same direction, the comparative rarity of automobiles 14 years old on the highway, the location between small towns, the paucity of traffic on the highway, and the limitation of time between the observation and the accident. If the entire case of negligence were to be based on this witness's testimony, it would not be sufficient to support a verdict; but, viewed as an aid in explaining just what happened prior to the overturning of the vehicle, it was properly admitted, leaving its weight to the determination of the jury.

■ In addition to the evidence of intoxication of the deceased and evidence of speed prior to the accident, there is evidence that the deceased lost control of his car, went into the borrow pit on the east side of the highway and traveled some 300 feet in the pit, returned to the oiled portion of the road, went into a skid and overturned. Also, the right rear tire was shredded and mutilated; Officer Benson did not know whether it was the blowing of the tire that caused the vehicle to go out of control or whether the tire had blown out in the process of the overturning, but he indicated that the condition of the tire

showed that it had gone through a number of revolutions while flat. The mere recitation of the facts indicate decedent's negligent operation of his automobile prior to its overturning and certainly presents a jury question as to both negligence and proximate cause. To discuss this point at length would extend unnecessarily this opinion.

A more troublesome question is whether plaintiff was guilty of contributory negligence as a matter of law in (1) traveling at an excessive rate of speed, (2) in failing to have her automobile under proper control, or (3) in failing to keep a proper lookout.

Defendant pits the physical evidence, that the overturned auto was moved some 30 feet by the impact and that the plaintiff's auto continued 25 feet after the impact before stopping, against the plaintiff's testimony that prior to observing the parked truck she was driving within the posted speed limit of 50 miles and applied her brakes to reduce her speed while passing the truck; he claims that the physical evidence is such as to render plaintiff's testimony unbelievable. It is true that plaintiff's automobile hit the overturned car with considerable force, damaging plaintiff's automobile beyond repair; but this is not such evidence as would permit the court's ruling that she was traveling at a speed in excess of that to which she testified. As respondent points out in her brief, part of

the distance which the disabled auto was moved is accounted for by the peculiar results of the crash. Officer Benson testified that it was his opinion that the auto did a half roll, resting with its top facing north rather than south as was its original position and moved an additional 5 feet under the impetus of its own weight.

The real question, then, is whether plaintiff, realizing that her vision was somewhat obscured by the lights of the truck on the opposite side of the road was under a duty to stop or slow to such a degree that she could have stopped within 10 feet, the distance at which she first fully applied her brakes. Such a stop could have been made safely had she been driving at a speed of 10 to 15 miles per hour, whereas, by her own testimony, her speed at that point was 30 to 35 miles per hour.

Respondent concedes, and the court so instructed the jury, that plaintiff was under a higher duty of care when her vision was interfered with by the lights of the oncoming truck. Appellant, however, maintains that under our decided cases, it was negligence as a matter of law for the plaintiff to have proceeded knowing that she could not see beyond the lights of the truck, which at a distance of 100 feet obscured her vision so that she could only see immediately in front of her car and the shoulder to the right.

The rule that a motorist is normally required to so operate his machine

as to be able to see and avoid substantial discernible objects in the road ahead is generally recognized, as is its concommitant that the motorist must equip his machine with proper headlights and be able to stop within the distance of the lights' projection. However, this does not mean that a motorist striking an object in the highway is guilty of negligence as a matter of law under any and all conditions. The case of Dalley v. Mid-Western Dairy Products Co., 80 Utah 331, 15 P.2d 309, upon which appellant relies, merely announces that general rule, holding that the plaintiff who struck an unlighted truck on an unobstructed highway was guilty of contributory negligence either in failing to maintain the proper lighting equipment or in failing to observe what proper lights would have shown. The case of Nikoleropoulos v. Ramsey, 61 Utah 465, 214 P. 304, 306, held that it was error to refuse the following instruction:

" 'You are instructed it is negligence as a matter of law for a person to drive an automobile upon a traveled public highway, used by vehicles and pedestrians, at such a rate of speed that said automobile cannot be stopped within the distance at which the operator of said car is able to see objects upon the highway in front of him.' "

But this case has been modified by subsequent cases permitting the jury to determine, *in the light of existing conditions,* what a reasonable and prudent person would do under the circumstances. Moss v. Christensen-Gardner, Inc., 98 Utah 253, 98 P.2d 363 (an accumulation of smoke and mist in addition to a sudden glare from the lights of an approaching automobile); Nielsen v. Watanabe, 90 Utah 401, 62 P.2d 117 (sudden blinding lights); Trimble v. Union Pacific Stages, 105 Utah 457, 142 P.2d 674 (fog); Hodges v. Waite, 2 Utah 2d 152, 270 P.2d 461 (curve in the road obscuring the obstruction).

Appellant reads these later cases as indicating that the only conditions which may be considered by the jury are those which occur so suddenly and without warning that the motorist has no opportunity to stop his vehicle. However, as respondent points out, neither the fog in the Trimble case nor the curve in the Hodges case were unforeseeable, and in those cases the motorist was not required to stop but merely to exercise more than the ordinary amount of care.

This court has not ruled directly on whether a motorist whose vision is interfered with by the lights of other vehicles on the highway has the duty to stop or continue at his peril. Early cases in other jurisdictions apparently regarded the situation as merely another instance calling for the application of the rule that a motorist must drive within the assured clear dis-

tance ahead, thus precluding recovery in any case against one who has negligently obstructed the road. However, the conditions of modern travel have caused many of these same courts to abandon the rule for the doctrine that the duty of the motorist so blinded is determinable by the standard of the ordinary care exercised by a reasonably prudent person under the same circumstances. See the extensive annotation 22 A.L.R.2d 297.

As is stated in Frowd v. Marchbank, 154 Wash. 634, 283 P. 467, 469:

"* * * The trial court held, if we have correctly gathered its meaning, that the negligence of the appellant consisted in driving past an automobile whose lights obscured the vision of the highway behind it. But everyone who has driven an automobile in the nighttime, and every observant person who has ridden in an automobile in the nighttime and has met an oncoming automobile with burning lights, knows that the lights obscure objects behind it for a considerable distance before the automobile is reached until a time after its lights are passed, and to say that it is negligence to drive past an automobile in such a situation is practically to say that it is negligence to drive along a highway in the nighttime at all. It must be remembered that both automobiles are in the same situation, and,

if one must stop, so must the other, and, if the rule stated by the court is to be applied, it would require some rather intricate maneuvering for the one to get by the other without violating the law. * * *"

The plaintiff testified that she was applying the brakes intermittently in order to slow her car prior to reaching the point at which the truck was parked, although she could not tell at what speed her car was going at that time. She saw nothing at this point to give her warning of the wreck ahead and saw the vehicle in the road only about 10 or 15 feet beyond where her vision again became clear. The jury determined that her conduct was reasonable under the circumstances and we feel that the law lays no heavier duty upon her.

Although the issue was not raised during the trial of this case, nor argued on appeal, the question of whether or not plaintiff had the burden of proving, as an element of her cause of action, that Anderson was alive at the time of the collision challenges our attention. The survival statute, U.C.A.1953, 78–11–12, provides that the cause of action shall not abate upon the death of the wrongdoer; thus, the cause of action cannot arise at a time beyond the life of the tortfeasor.

The time of death of a tortfeasor has been presented as an issue in jurisdictions

having survival statutes similar to ours, usually where there is no evidence as to the precise cause or time of death other than the fact that the deceased's body was taken from the wreckage. Reasoning that this type of remedial statute is to be construed liberally, these courts have held that where the wrongdoer's death seems to have occurred instantly as a result of his negligent act, his negligence preceded his death and, therefore, a cause of action existed prior to the death of the wrongdoer. Booth v. Frankenstein, 209 Wis. 362, 245 N.W. 191; Kerr v. Basham, 64 S.D. 27, 264 N.W. 187; Merrill v. Beckwith, 5 Cir., 61 F.2d 912. These cases apparently assume that the cause of death was the collision and reason that some injury, though perhaps not the entire damage, must have occurred prior to the time of the wrongdoer's death. The philosophy of liberal construction demonstrated by these cases is emphasized in Justin v. Ketcham, 297 Mich. 592, 298 N.W. 294, 296, wherein it is stated:

> "On principle, there would seem to be no reason for a different holding where a right of action exists for an injured party, or on behalf of one killed in a collision, where the admitted wrongdoer lives a few minutes, although unconscious * * *, and in another case where the wrongdoer is considered to have died in the one-tenth of a second as a result of the tort. Such a re-

finement of the law would obstruct justice rather than accomplish it. The present theory of the law is compensation for the injury. It is impossible to see why a wrongdoer's estate through a fiction of the law should be exempted from making satisfaction for his wrongdoing."

Although the reasoning of these cases is not helpful as to the facts of the present case inasmuch as Anderson's death may have occurred either in the collision or prior thereto when the deceased overturned his car and we have no evidence concerning that matter, the cases do point the way to the interpretation of the statute. The courts apparently do not require that plaintiff sustain the burden of proving that the deceased was alive immediately prior to the accident and died as a result of the collision. Therefore, their conclusion must be explained on the basis of a presumption of continuing life until the contrary is proved.

However, only the burden of going forward with the evidence is shifted to the estate of the deceased and the burden of proof, or risk of non-persuasion, remains with the plaintiff as a part of his cause of action. Kartchner v. Horne, 1 Utah 2d 112, 262 P.2d 749. Concerning this particular presumption of the continuation of life, Professor Wigmore states:

302

"It is not possible to say that there is a genuine presumption of the continuance of a particular human life, with a uniform application. The state of the pleadings will show whose duty it is to prove that a particular person was living at a certain time; and upon his showing the mere fact of life at a preceding date, the Court will usually leave it to the jury to say whether he has proved his case, but may sometimes apply a genuine presumption, shifting the duty of producing evidence, upon the circumstances of the particular case." IX Wigmore on Evidence, Third Ed., Sec. 2531.

The burden of persuasion requires that the fact finder must be convinced by the evidence that the existing facts are in favor of the party who has such burden in order to find the issue of facts on that question in his favor. In re Swan's Estate, 4 Utah 2d 277, 293 P.2d 682. In the present case, the issue was not presented to, nor considered by the jury which found the facts. Under such circumstances, unless the evidence is sufficient for a directed verdict upon that question, the case must be remanded for a new trial.

■ Presumptions giving rise to the inference of fact are based upon circumstances from which is indicated a probability that the fact exists. The key is probability, the greater the probability of the fact, the greater the probative value of the circumstances.[1] The facts of the defendant being observed alive two hours before the first accident and his car being identified proceeding on the highway just preceding it are near enough to the event in point of time to lend a sufficient degree of probability to the fact that the defendant continued to live until the second accident that the jury could reasonably so find. The inference of fact to be drawn from this presumption could be rebutted only by some evidence which would reasonably support a finding to the contrary such as the severity of the first accident, or some other such evidence so indicating. The matter should be submitted to the jury with an explanation that if they believe from all of the facts and circumstances disclosed by the evidence that the deceased survived the first accident, then the cause of action survived and, other factors necessary to the plaintiff's cause being present, the plaintiff could recover; on the other hand, if from all of the facts and circumstances disclosed by the evidence they do not believe that the deceased survived the first collision then the plaintiff could not recover.

Were it not for the fact that this issue was not raised at the trial, the issue of survival of the defendant might now be settled as a matter of law. In view of the fact that the issue was neither raised nor tried, in fairness it should be sent back for a new

trial so that the parties will have a full opportunity to marshall and present whatever evidence they may be able to find relating to this issue.

■ Since the cause must be remanded for a new trial, an item included in the award of special damages requires our consideration, since it involves construction of the statute under which this action was allowed, U.C.A.1953, 78–11–12, supra. That statute specifically provides for survival of "causes of action arising out of physical injury to the person or death," but does not indicate that an action for property damage survives the death of the tortfeasor. For this reason, should plaintiff succeed upon the second trial of this case, she may not recover the amount claimed for loss of her automobile.

Reversed and remanded for a new trial in accordance with this opinion. Each party to bear his own costs.

CROCKETT and WADE, JJ., concur.

WORTHEN, J. concurs in the result.

HENRIOD, Justice (concurring in result).

I concur in the result and suggest that the evidence about the alcohol content of the blood should not have been admitted in evidence. To take blood from a dead man for evidence, at the behest of a police officer, without the consent of relatives, without an autopsy or other official justification, is no different, except as to degree of repulsiveness, than decapitating a dead man to obtain evidence without such consent or sanction, and is a liberty taken such as enrages one's sense of propriety and justice to the point that it should be inadmissible in evidence. To hold otherwise encourages indiscriminate and irresponsible mutilation of dead bodies and might actually lead to the death of a person, who, in fact was alive at the time of such mutilation, but who was thought to be dead by some irresponsible individual who may either order or execute the act of violating the person. It is no answer to say that this court has placed the stamp of approval on admitting illegally obtained evidence—a practice whose sanction would not be shared by this writer, if not established by precedent. The evidence here is not so much illegally obtained as it is shocking to one's sensibility, and it should be refused in evidence on the basis that it is so contrary to the American sense of justice as to be excludable.