Prochnow, Respondent, vs. Prochnow, Appellant.*

*December 6, 1956—January 7, 1957.*

* Motion for rehearing denied, with $25 costs, on March 5, 1957.

For the appellant there was a brief by *Kenney & Hays* of Milwaukee, and oral argument by *Byron J. Hays*.

For the respondent there was a brief by *Alvin L. Zelonky* of Milwaukee, and oral argument by *Mr. Zelonky* and by *Mr. Harry E. Fryatt, Jr.,* of Waukesha.

BROWN, J. The trial judge found the fact to be that Robert is the father of Joyce's child. The question is not whether, on this evidence, we would have so found: What we must determine is whether that finding constituted reversible error.

Sec. 328.39 (1) (a), Stats., commands:

"Whenever it is established in an action or proceeding that a child was born to a woman while she was the lawful wife of a specified man, any party asserting the illegitimacy of the child in such action or proceeding shall have the burden of proving beyond all reasonable doubt that the husband was not the father of the child. . . ."

Ignoring for the moment the evidence of the blood tests and the effect claimed for them, the record shows intercourse between married people at a time appropriate to the conception of this baby. The husband's letters after the child's birth acknowledge it is his own. The wife denies intercourse with any other man during the entire period when she could have conceived this child. Unless we accept the illegitimacy of the baby as a fact while still to be proved, there is no evidence that then, or ever, did she have intercourse with anyone else. The wife's conduct with Andy on the few occasions when the witness saw them together can justly be called indiscreet for a married woman whose husband is absent, but falls far short of indicating adultery. Indeed, appellant did not assert that Andy is the real father but left that to the imagination of the court whose imagination, as it turned out, was not sufficiently lively to draw the inference. Cynics, among whom on this occasion we must reluctantly number ourselves, might reasonably conclude that Joyce, finding herself pregnant in February or early March, made a hasty excursion to her husband's bed and an equally abrupt withdrawal when her mission was accomplished. The subsequent birth of a full-term child a month sooner than it would usually be expected if caused by this copulation does nothing to dispel uncharitable doubts. But we must acknowledge that a trial judge, less inclined to suspect the worst, might with reason recall that at least as early as the preceding August Joyce had lost her taste for her husband's embraces. Divorce offered her freedom from them, but magnanimously she might deter-

mine to try once more to save the marriage; hence her trip to Texas. But when the night spent in Robert's arms proved no more agreeable than such nights used to be she made up her mind that they could live together no more, frankly told him so, and took her departure. The medical testimony concerning the early arrival of the infant does no more than to recognize eight months of gestation as unusual. It admits the possibility that Robert begat the child that night in that San Antonio hotel. Thus, the mother swears the child is Robert's and she knew, in the Biblical sense, no other man. Robert, perforce, acknowledges that it may be his. Everything else depends on such reasonable inferences as one chooses to draw from the other admitted facts and circumstances. And such inferences are for the trier of the fact. Particularly, in view of sec. 328.39 (1) (a), Stats., *supra,* we cannot agree with appellant that even with the blood tests left out of consideration, the record here proves beyond a reasonable doubt that Joyce's husband was not the father of her child.

Accordingly we turn to the tests. The expert witnesses agreed that the tests excluded Mr. Prochnow from all possibility of this fatherhood. Appellant argues that this testimony is conclusive; that with the tests in evidence Joyce's testimony that she had no union except with her husband is insufficient to support a finding that her husband is the father. The conclusive effect of the blood test is sometimes imposed by statute, such as is found in secs. 4 and 5 of the Uniform Act on Blood Tests to determine paternity, presently in force in California, Michigan, New Hampshire, and Oregon. But the Wisconsin statute authorizing blood tests in paternity cases pointedly refrains from directing courts to accept them as final even when they exclude the man sought to be held as father. In its material parts it reads:

"Sec. 325.23. Blood tests in civil actions. Whenever it shall be relevant in a civil action to determine the parentage

or identity of any child, . . . the court . . . may direct any party to the action and the person involved in the controversy to submit to one or more blood tests, to be made by duly qualified physicians. . . . Whenever such test is ordered and made the results thereof shall be receivable in evidence, but only in cases where definite exclusion is established. . . ."

This statute does no more than to admit the test and its results in evidence, there to be given such weight and credibility in competition with other evidence as the trier of the fact considers it deserves. No doubt in this enactment the legislature recognized that whatever infallibility is accorded to science, scientists and laboratory technicians by whom the tests must be conducted, interpreted, and reported retain the human fallibilities of other witnesses. It has been contended before this that a report on the analysis of blood is a physical fact which controls a finding of fact in opposition to lay testimony on the subject, and the contention was rejected. *Kuroske v. Aetna Life Ins. Co.* (1940), 234 Wis. 394, 401, 402, 291 N. W. 384. When the trial judge admitted the Prochnow tests in evidence and weighed them against the testimony of Mrs. Prochnow he went as far in giving effect to them as our statute required him to do. Our opinions say too often that trial courts and juries are the judges of the credibility of witnesses and the weight to be given testimony which conflicts with the testimony of others for us to say that in this case the trial court does not have that function.

In bastardy actions "a verdict of guilty can only be properly reached when the presumption of innocence recognized as surrounding such accused has been overcome by evidence convincing the jury beyond reasonable doubt." *Windahl v. State* (1926), 189 Wis. 424, 427, 207 N. W. 694; *Timm v. State* (1952), 262 Wis. 162, 54 N. W. (2d) 46. Even with this legal principle in his favor, in a bastardy action

the testimony of the woman that she had timely intercourse with the man and that she had none with anyone else, if believed by the jury, is sufficient to support a verdict that he is the father of her child. *Wille v. State ex rel. Kessler* (1927), 192 Wis. 224, 212 N. W. 260; *State v. Willing* (1951), 259 Wis. 395, 48 N. W. (2d) 236. That is the common rule. "In the absence of a statute requiring corroboration, the jury may find that defendant is the father of the child on the sole testimony of the mother, provided they believe it to be credible." 10 C. J. S., Bastards, p. 179, sec. 94. So, if Joyce and Robert were not married and the child now in question had been born to Joyce her testimony of intercourse with him, which he admits, and her denial of it with any other man would, if believed by the trier of the fact, be sufficient to establish that Robert is the child's father beyond a reasonable doubt. How much greater, then, is the sufficiency of the same testimony, when believed by the trial court, to establish such fatherhood when, the parties being married to each other, the burden of proof has been reversed by statute, *supra,* and the burden is now Robert's to prove beyond reasonable doubt that he is *not* the parent. The conclusion seems inescapable that the trial court's finding must stand when the blood-test statute does not make the result of the test conclusive but only directs its receipt in evidence there to be weighed, as other evidence is, by the court or jury. We hold, then, that the credibility of witnesses and the weight of all the evidence in this action was for the trial court and error cannot be predicated upon the court's acceptance of Joyce's testimony as more convincing than that of the expert witnesses. On substantially identical facts in *Arais v. Kalensnikoff* (1937), 10 Cal. (2d) 428, 74 Pac. (2d) 1043, the California court reached the same conclusion.

*By the Court.*—Judgment affirmed.

WINGERT, J. (*dissenting*). With all respect for the views of the majority, Mr. Chief Justice FAIRCHILD, Mr. Justice CURRIE, and the writer must dissent. In our opinion the appellant, Robert Prochnow, sustained the burden placed upon him by sec. 328.39 (1) (a), Stats., of proving beyond all reasonable doubt that he was not the father of the child born to the plaintiff.

To meet that burden, appellant produced two classes of evidence, (1) testimony of facts and circumstances, other than blood tests, which create grave doubt that appellant is the father, and (2) the evidence of blood tests and their significance, hereinafter discussed. In our opinion the blood-test evidence should have been treated as conclusive in the circumstances of this case.

Among the numerous scientific achievements of recent decades is the development of a method by which it can be definitely established in many cases, with complete accuracy, that one of two persons cannot possibly be the parent of the other. The nature and significance of this discovery are summarized by the National Conference of Commissioners on Uniform State Laws, a highly responsible body, in the prefatory note to the Uniform Act on Blood Tests to Determine Paternity, as follows:

"In paternity proceedings, divorce actions, and other types of cases in which the legitimacy of a child is in issue, the modern developments of science have made it possible to determine with certainty in a large number of cases that one charged with being the father of a child could not be. Scientific methods may determine that one is not the father of the child by the analysis of blood samples taken from the mother, the child, and the alleged father in many cases, but it cannot be shown that a man is the father of the child. If the negative fact is established it is evident that there is a great miscarriage of justice to permit juries to hold on the basis of oral testimony, passion, or sympathy, that the person charged is the father and is responsible for the support of the child and other incidents of paternity. . . .

"There is no need for a dispute among the experts, and true experts will not disagree. Every test will show the same results. . . .

"As to the make-up of the blood, the testing process is reasonably simple. It is practically the same thing in which the 11 million or more men were tested in determining blood types in the service. It is the same kind of test made of the blood of donors to the Red Cross and hospital blood banks. Consequently, this is one of the few classes of cases in which judgment of court may be absolutely right by use of science. In this kind of a situation it seems intolerable for a court to permit an opposite result to be reached when the judgment may scientifically be one of complete accuracy. For a court to permit the establishment of paternity in cases where it is scientifically impossible to arrive at that result would seem to be a great travesty on justice." Uniform Laws Anno., 9 Miscellaneous Acts, 1955 Supp., pp. 12, 13.

In the present case the evidence showed without dispute that the pertinent type of tests were made of the blood of the husband, the wife, and the child on two separate occasions by different qualified pathologists, at separate laboratories, and that such tests yielded identical results, as follows:

|  | 3/17/55 | 9/29/55 |
|---|---|---|
|  | Blood Types | |
| Robert Prochnow (Husband) | AB | AB |
| Joyce Prochnow (Wife) | O | O |
| David Prochnow (Child) | O | O |

There is no evidence whatever that the persons who made these tests were not fully qualified experts in the field of blood testing, nor that the tests were not made properly, nor that the results were not correctly reported to the court. The tests were voluntarily submitted to by the adult parties, and with the consent of the guardian *ad litem* of the child.

Two qualified experts in the field also testified that it is a physical impossibility for a man with type AB blood to be the father of a child with type O blood, and that therefore

appellant is not and could not be the father of the child David. Both testified that there are no exceptions to the rule. One stated "There is no difference of opinion regarding these factors amongst the authorities doing this particular work. None whatsoever." The evidence thus summarized was not discredited in any way and stands undisputed in the record. Indeed, there was no attempt to discredit it except by the wife's own self-serving statement that she had not had sexual relations with any other man during the period when the child might have been conceived.

The undisputed testimony of the two experts is abundantly confirmed by authoritative scientific textbooks and writings. For example:

"Since the agglutinogens O, A, B, M, and N, Rh, Hr, P, S, s, etc., are inherited, blood grouping can be applied to the problem of paternity. There are certain fundamental facts on which this statement is based. First, agglutinogens A and B (or any other agglutinogen) cannot appear in the blood of a child unless present in the blood of one or both parents. Second, *an AB individual cannot give rise to a group O child,* nor can an O person give rise to an AB child. . . . (Emphasis supplied.)

*"Summary of Facts Concerning the Heredity of Blood Groups.* . . . An AB individual cannot be the parent of an O child." Gradwohl, Legal Medicine, pp. 534, 544.

"The most important laws which govern inheritance of groups O, A, B, and AB are: . . . 2. An O parent cannot have an AB child and an AB parent cannot have an O child (Bernstein)." Gonzales, Vance, Helpern, Umberger, Legal Medicine, Pathology and Toxicology (2d ed.), p. 662.

The subject is discussed at length in Schatkin, Disputed Paternity Proceedings (3d ed.), from which the following conclusions are quoted pp. 167, 168):

"The firmly established laws of inheritance are as follows:
"(1) The agglutinogens A and B cannot appear in the blood of a child unless present in the blood of one or both parents.

"(2) A parent belonging to group AB cannot give rise to a group O child, and a group O parent cannot give rise to a group AB child."

An interesting nontechnical verification of accuracy of the blood-test exclusions is given by Schatkin, as follows (p. 289):

"During the ten-year period March 22, 1935, to March 22, 1945, 656 blood tests carried out in affiliation cases by order of the court of special sessions in New York City resulted in 65 exclusions. The question naturally arises, Were those exclusions accurate? The answer is 'Yes,' because each and every one of those 65 exclusions was followed by the mother's subsequent confession, for the first time, of sexual relations with another man about the time she became pregnant."

The court may take judicial notice of facts appearing so abundantly from authoritative works on the subject. *Werk v. Parker,* 249 U. S. 130, 133, 39 Sup. Ct. 197, 63 L. Ed. 514; *Ritholz v. Johnson,* 244 Wis. 494, 12 N. W. (2d) 738; *State ex rel. Thomson v. Giessel,* 271 Wis. 15, 45, 46, 72 N. W. (2d) 577; *Huber v. Merkel,* 117 Wis. 355, 359, 94 N. W. 354.

Without laboring the matter further, we must conclude that it is definitely established as a matter of scientific fact that a man with type AB blood cannot possibly be the father of a child with type O blood. Under established laws of genetics, well known to those learned in that field, he can no more be the father of such a child than a dog can be the father of a cat. It is a matter of common knowledge and hence of judicial notice, even though the general public knows little about it and only those working or interested in the field are familiar with it. *Ritholz v. Johnson,* 244 Wis. 494, 501, 12 N. W. (2d) 738.

As pointed out previously, the fact that appellant has type AB blood and the child has type O blood was established by uncontradicted evidence—evidence of two tests by different

experts in different laboratories at widely different times, reaching exactly the same result. The correctness of the procedures followed in making the tests and the qualifications and disinterestedness of the experts who made them and testified about them are unchallenged.

This court has frequently held that the testimony of a witness or finding of a jury which is contrary to unquestionable physical situations or common knowledge, is of no weight in favor of the side it is invoked to support, and indeed may be self-destructive, being successfully impeached by its demonstrated improbability or impossibility. *Heibel v. Voth,* 271 Wis. 350, 352, 73 N. W. (2d) 421, and cases cited. Thus it is frequently held in negligence cases that testimony as to location, speed, and the like must give way to physical facts established by uncontradicted testimony. For instance, if verified skid marks show that a car traveled on the left side of the road when and after the brakes were applied sufficiently to slide the wheels, no weight can be given to testimony of the driver and his passengers that he was at all times in the right-hand traffic lane. See *Hunter v. Sirianni Candy Co.* 233 Wis. 130, 134, 288 N. W. 766; *Burns v. Weyker,* 218 Wis. 363, 369, 373, 261 N. W. 244.

" 'Where all reasonable probabilities from facts unquestionably established by the evidence are on one side of a controversy, the testimony of an interested party to the contrary does not create a conflict of evidence requiring such controversy to be submitted to and determined by a jury, or, if submitted, support their determination, if contrary to all such reasonable probabilities.' " *Stryk v. Sydarowich,* 198 Wis. 542, 544, 224 N. W. 479.

We think the same principle applies here. Undisputed evidence having shown that appellant had type AB blood and the child had blood of type O, and that therefore, as a matter of physical fact, the child cannot be the child of appellant, the

trial judge could not properly base a finding to the contrary on the mother's testimony and the presumption of legitimacy.

In a number of states, the courts have recognized the conclusive character of evidence comparable to that under discussion. See Anno. in 46 A. L. R. (2d) 1000, 1028, and cases cited, particularly *Jordan v. Mace,* 144 Me. 351, 69 Atl. (2d) 670.

The reluctance of other courts to give proper weight to scientifically established fact in situations of this sort has been explained, we think correctly, by an authority on legal medicine as follows:

"Judicial disregard of blood-test exclusions is no doubt due to a misconception of the true nature of the exclusion, which is a demonstrable and scientific fact of life. It is neither controversial nor in the field of expert testimony. The pathologist whose report excludes paternity is not giving 'opinion' evidence. He is testifying to the reaction of the red-blood cells—testifying to a fact of life and Nature." Gradwohl, Legal Medicine, p. 576.

Because of that reluctance, the National Conference of Commissioners on Uniform State Laws has drafted a uniform act on blood tests to determine paternity, which has been enacted in the states of California, Michigan, New Hampshire, and Oregon. The act contains the following provisions:

*"Effect of Test Results.*—If the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence.
. . .

*"Effect on Presumption of Legitimacy.*—The presumption of legitimacy of a child born during wedlock is overcome if the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, show that

the husband is not the father of the child." Uniform Laws Anno., 9 Miscellaneous Acts, 1955 Supp., pp. 20, 21, secs. 5, 6.

While Wisconsin has no such legislation, the facts on which the uniform act is based are as true here as anywhere else, and should be recognized by our courts in the absence of legislation. The constitution of the state confers the judicial power on the courts (sec. 2, art. VII). The decision of questions of fact, and determination of the weight to be given to evidence of various types, are judicial functions exercised by the courts from time immemorial. It is the duty of the courts, as well as their power, to adopt the principles of proof best calculated to determine such questions correctly. They should not wait for the legislature to take the initiative to that end. Courts should not shut their eyes to advances in science which conclusively establish a fact, by simply repeating the age-old maxim that credibility of witnesses is for the trier of fact.

In the instant case, we are satisfied that the trial court failed to give proper weight to the unimpeached evidence with respect to blood tests, and that in so doing, and thereby holding the appellant responsible for the support of another man's child, the decision will work a grave injustice.

In coming to the conclusions above stated, we do not overlook the possibility of human error in blood testing as in other procedures. We would preserve to the party against whose contentions blood tests operate to the fullest opportunity to challenge the qualifications of the testers, the propriety of the testing procedures, and the correctness of the report of their result. The plaintiff had such opportunity here, and failed to discredit the tests or the testers in the slightest degree. The tests were therefore entitled to full weight.