713 A.2d 20 (1998)
313 N.J. Super. 165
Harold E. SMITH, Executor of the Estate of Helen Robbins, Deceased, Plaintiff-Respondent Cross-Appellant,
v.
Alan L. WHITAKER, Jr., Defendant-Respondent, and
Coastal Oil of New York, Inc., (incorrectly pled as Coastal Oil Company of New York, Inc., and formerly known as Belcher Company of New York, Inc.), Defendant-Appellant Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued April 22, 1998.
Decided June 15, 1998.
*22 John C. Eastlack, Jr., Turnersville, for defendant-appellant/cross-respondent (Poplar & Eastlack, attorneys; Mr. Eastlack, on the brief).
Theodore E. Baker, Bridgeton, for plaintiff-respondent/cross-appellant (Lummis, Krell & Baker, attorneys; Mr. Baker, on the brief).
Before Judges KING, KESTIN and CUFF.
*21 The opinion of the court was delivered by KING, P.J.A.D.

I
This case involves claims for wrongful death and survival action damages. Plaintiff obtained a modest compensatory award of $40,178 (plus the net funeral and burial expenses of $3,939) under the Wrongful Death Act, N.J.S.A. 2A:31-1 to -6, and a punitive damage award of $1.25 million under the Survivor's Act, N.J.S.A. 2A:15-3. Defendant Coastal Oil of New York, Inc. (Coastal) challenges the punitive damage verdict on a number of grounds. We find no error and affirm.

II
On January 4, 1990 Helen V. Robbins (Mrs. Robbins), a widow, age 60, was driving her 1979 Lincoln Town Car north on County Route 649 in Commercial Township, Cumberland County. On the same day, Alan L. Whitaker, Jr. (Whitaker), an employee of Coastal, was driving a 36,000-pound Coastal oil truck south on County Route 633. The southbound lane of County Route 633 was governed by two yield signs where it intersects County Route 649. Due to maladjusted rear brakes, Whitaker was unable to stop the truck, even though he was "standing" on the brakes. The truck crossed the intersection, struck Mrs. Robbins' automobile, and overtopped it. Mrs. Robbins died in the accident.
Harold E. Smith, the nominal plaintiff, executor of Mrs. Robbins' estate, filed an action under the Wrongful Death Act, N.J.S.A. 2A:31-1 to -6, and under the Survivor's Act, N.J.S.A. 2A:15-3, against Whitaker and Coastal (collectively defendants). Smith died in 1995 and Grant Keller was appointed to replace him as plaintiff.
On its appeal, Coastal raises many issues, but primarily contends that, as a matter of law, plaintiff should not recover punitive damages. We disagree.

III
On June 8, 1990 the plaintiff executor filed this action under the Wrongful Death Act and Survivor's Act against defendants. Among other things, plaintiff claimed that the Coastal oil truck driven by Whitaker on January 4, 1990 had been "improperly serviced and maintained, in that the brake systems, air hoses and braking mechanisms were faulty, defective and not in proper working order." Plaintiff also alleged that "defendants ... either knew or should have known that the braking systems and braking mechanisms on the vehicle being operated by... Whitaker ... were faulty, defective and not in proper working order, but ... defendants negligently, recklessly and with callous disregard for the safety of others, failed to take such proper steps as were necessary to adequately service, maintain and ensure that the braking mechanisms on said vehicle were in proper working order." Finally, plaintiff alleged that the "carelessness and recklessness" of defendants was "willful, wanton, and with knowledge of a high degree of probable *23 harm to others such that the deliberate and wanton failure of the defendants ... should be assessed with punitive and exemplary damages."
On May 9, 1995 the first jury trial began. After all sides rested on May 11, 1995 they agreed to the judge's suggestion to select a second, different jury to decide the "punitive damage issue."
On May 12, 1995 the first jury was asked to answer this question: "What amount of money, if any, would fully and fairly compensate Lois Buttner as the survivor of Helen V. Robbins for the actual pecuniary or financial loss suffered by Lois Buttner due to the death?" The jurors (6-0) answered "$40,178" to this question. Following this, the judge molded the verdict by adding the net "funeral bill and expense" of $3,939, for a total judgment of $44,117. On May 30, 1995 the judge entered a judgment against defendants reflecting that the jury had "rendered a verdict in the amount of $40,178 pursuant to the Wrongful Death Act, N.J.S.A. 2A:31-1, et seq.," and that the judge had "molded the verdict as to funeral and burial expenses pursuant to the Survivor's Act, N.J.S.A. 2A:15-3 to include the sum of $3,939.00."
On May 15, 1995 Coastal filed a motion to dismiss plaintiff's punitive damage claim. In response, plaintiff filed a cross-motion for a new trial on the wrongful death damages claim. The judge denied Coastal's motion, holding that plaintiff's claim for "punitive damages" against defendants "could be properly presented under the survivorship statute." The judge also denied plaintiff's crossmotion for a new trial on the "compensatory damages." Finally, the judge ruled that the "funeral bill" of $3,939 "would properly be included in the wrongful death aspect of the case."
On July 15, 1996 the punitive damage trial began before a new jury. With the consent of plaintiff and Coastal, plaintiff's punitive damage action against Whitaker was dismissed. On July 25, 1996 the jury was asked to answer two questions. The first question was: "Do you find that the conduct of the Defendant, Coastal Oil Company, gave rise to a claim for punitive damages?" The jurors (6-0) answered "yes" to that question. The second question was: "What is the proper amount of punitive damages to be awarded in this case against Coastal Oil Company of New York?" The jurors (6-0) answered "one million, two hundred fifty thousand" to that question.
On August 5, 1996 Coastal filed a motion for a new trial or remittitur. On September 5, 1996 the judge entered an order denying Coastal's new trial motion. In this order, the judge at Coastal's request amended the judgment entered on May 30, 1995 to reflect that the "molded verdict including funeral and burial expenses were recovered pursuant to the Wrongful Death Act, N.J.S.A. 2A:31-1 et seq." Both parties then appealed.

IV
Coastal raises nine points on its appeal:
1. DID THE JUDGE ERR IN HOLDING THAT PUNITIVE DAMAGES ARE RECOVERABLE UNDER THE WRONGFUL DEATH ACT?
2. DID THE JUDGE ERR IN NOT DISMISSING PLAINTIFF'S PUNITIVE DAMAGE CLAIM AS A MATTER OF LAW, BECAUSE NO COMPENSATORY DAMAGES WERE RECOVERED BY PLAINTIFF UNDER THE SURVIVORSHIP ACTION?
3. MUST THE PUNITIVE DAMAGE AWARD BE REVERSED, BECAUSE THE FACTS OF THIS CASE DO NOT MEET THE THRESHOLD FOR EGREGIOUS CONDUCT NECESSARY FOR THE IMPOSITION OF PUNITIVE DAMAGES?
4. DID THE JUDGE ERR IN DENYING COASTAL'S MOTION TO BAR PLAINTIFF'S EXPERTS AND IN REJECTING ITS OBJECTION TO ONE EXPERT RENDERING AN OPINION AS TO CAUSATION?
5. DID THE JUDGE ERR IN DENYING COASTAL'S MOTION TO STRIKE THE PUNITIVE DAMAGE AWARD OR, IN THE ALTERNATIVE, FOR REMITTITUR, BECAUSE THE $1.25 MILLION *24 AWARD WAS CLEARLY EXCESSIVE, AND NOT IN ACCORDANCE WITH THE PUNITIVE DAMAGES ACT?
6. DID THE JUDGE ERR IN DENYING COASTAL'S MID-TRIAL MOTION TO RECUSE HIMSELF?
7. WAS THE JURY'S PUNITIVE DAMAGE VERDICT THE PRODUCT OF PASSION OR PREJUDICE, BECAUSE THE JURY APPARENTLY DID NOT UNDERSTAND THE ISSUE OF PROXIMATE CAUSE OR THE STANDARDS BY WHICH TO MEASURE CONDUCT IN DETERMINING WHETHER PUNITIVE DAMAGES WERE APPROPRIATE?
8. DID THE JUDGE ERR IN PERMITTING IMPROPER FINANCIAL INFORMATION TO BE PLACED BEFORE THE JURY TO CONSIDER IN DETERMINING A PUNITIVE DAMAGE AWARD?
9. DID THE JUDGE ERR IN ADMITTING INTO EVIDENCE COASTAL'S FEDERAL HIGHWAY ADMINISTRATION CARRIER PROFILE FOR THE PERIOD JULY 22, 1994 TO JULY 22, 1996?
Plaintiff's sole point on the cross-appeal states:
DID THE JUDGE MAKE SEVERAL TRIAL ERRORS WHICH MUST BE ADDRESSED IN THE EVENT THIS MATTER IS REVERSED AND A RETRIAL IS ORDERED?

V
Coastal first contends that the judge "erred in holding that punitive damages are recoverable under [the] New Jersey Wrongful Death Act." The judge made no such ruling and would have erred if he had. The judge said that: "In a wrongful death action, perhaps punitive damages would not be appropriate." With regard to the "punitive damage issue," he ruled that this issue "could be properly presented under the survivorship statute."
When the death of a person is caused by the "wrongful act, neglect or default" of another, an "action for damages" arises. N.J.S.A. 2A:31-1. In "every action" brought under N.J.S.A. 2A:31-1, the jury can only award damages "with reference to the pecuniary injuries resulting from such death, together with the hospital, medical and funeral expenses incurred for the deceased" to the "persons entitled to any intestate personal property of the decedent." N.J.S.A. 2A:31-5. In this case, the sole surviving adult child, Lois Buttner, was the only eligible beneficiary under the Wrongful Death Act. See N.J.S.A. 2A:31-4.
This aspect of the Wrongful Death Act was explained in Turon v. J. & L. Constr. Co., 8 N.J. 543, 86 A.2d 192 (1952):
The evident policy of the statute is the recovery of damages for the pecuniary injury sustained by the designated beneficiaries. The act is essentially remedial rather than penal. Damages are assessed to compensate for the injuries sustained by the persons to whom they are payable.

[8 N.J. at 555-56, 86 A.2d 192.]
The design of section 5 [N.J.S.A. 2A:31-5], from the very beginning, was the limitation of the measure of damages to the "pecuniary injuries" sustained by the statutory beneficiaries as the result of the death. The statutory policy was remedial and not punitive.

[Id. at 557, 86 A.2d 192.]
See Carey v. Lovett, 132 N.J. 44, 67, 622 A.2d 1279 (1993) ("Damages for the wrongful death of an infant, like wrongful-death damages generally, are limited to economic matters."); Graf v. Taggert, 43 N.J. 303, 311, 204 A.2d 140 (1964) ("Our [Wrongful] Death Act was not intended to grant damages against a tortfeasor merely to punish him."); Goss v. American Cyanamid, Co., 278 N.J.Super. 227, 241, 650 A.2d 1001 (App.Div.1994) ("An award of damages in a wrongful death action is not intended to punish the tortfeasor, but only to replace that which the decedent likely would have provided."); DeFelice v. Beall, 274 N.J.Super. 592, 599, 644 A.2d 1136 (App. Div.) ("The purpose of New Jersey's Wrongful Death Act is to provide compensation for pecuniary losses suffered by survivors of those killed by wrongful acts."), certif. denied, *25 138 N.J. 268, 649 A.2d 1288 (1994). In Meehan v. Central R.R. Co. of New Jersey, 181 F.Supp. 594 (S.D.N.Y.1960), the decedent's administrator sought to recover "punitive damages" under the "New Jersey Wrongful Death Statute, N.J.S.A. 2A:31-1 to 2A:31-6." Id. at 598. "In accordance with the compensatory nature of the New Jersey Wrongful Death Statute," the plaintiff's "punitive damage action on the wrongful death was dismissed." Ibid.
In Kern v. Kogan, 93 N.J.Super. 459, 462, 226 A.2d 186 (Law Div.1967), the administrators of the minor decedent filed a medical malpractice action against the defendant doctor who had treated the minor from March 9, 1964 to her death on March 18, 1964. Based primarily on Graf, 43 N.J. 303, 204 A.2d 140, and Meehan, 181 F.Supp. 594, the Law Division judge in Kern granted defendant's motion to dismiss plaintiffs' action to recover "punitive damages" from Kogan "under the Wrongful Death Act." Id. at 468-69, 226 A.2d 186. The judge explained:
A reading of the cases discloses that the status of the law in New Jersey bearing upon wrongful death actions would seem to restrict all such claims to compensatory damages, and therefore, the demands for punitive damages based upon the allegations that defendant Dr. Kogan was fraudulent, deceitful and negligent, which actions resulted in the death of decedent, will not lie and thus defendant's motion with respect to these counts will be granted.

[Id. at 469, 226 A.2d 186.]
New Jersey case law has not changed on this point since the Kern decision in 1967. See Jadlowski v. Owens-Corning Fiberglas Corp., 283 N.J.Super. 199, 213, 661 A.2d 814 (App.Div.1995), certif. denied, 143 N.J. 326, 670 A.2d 1066 (1996) (observing that a "punitive damages award is not to be considered compensatory," we noted that "punitive damages are not awarded for a wrongful death"). Punitive damages are not recoverable under most wrongful death statutes in this country. Ghiardi & Kircher, Punitive Damages § 5.19 n. 4 (Cum.Supp. 1992); Schlueter & Redden, Punitive Damages § 9.9(A) at 589 (3d ed. 1996).
We agree with Coastal that punitive damages are not available under our Wrongful Death Act. We also conclude that the jury made no such award.

VI
Since no traditional compensatory damages were recovered under the dismissed survivorship action, Coastal claims that plaintiff's demand for punitive damages should have been dismissed as a matter of law, citing O'Connor v. Harms, 111 N.J.Super. 22, 29-30, 266 A.2d 605 (App.Div.), certif. denied, 57 N.J. 137, 270 A.2d 40 (1970); Cooper Distributing Co. Inc. v. Amana Refrigeration, Inc., 63 F.3d 262 (3d Cir.1995); and Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir.1993). We disagree with Coastal's conclusory contention that because there were no traditional compensatory damages for pain and suffering under the survival action, "a punitive damages verdict cannot stand ... as a matter of law." Indeed, Mrs. Robbins sustained the ultimate injury or damage; her life was extinguished. Of interest, the jury was not asked to consider "nominal damages." In an action for malicious conversion of property and punitive damages, we have stated: "Assuming that compensatory damages cannot be proved beyond a nominal sum, the better view appears to be that exemplary damages may nevertheless be awarded in this type of action." Winkler v. Hartford Accident & Indemnity Co., 66 N.J.Super. 22, 29, 168 A.2d 418 (App.Div.), certif. denied, 34 N.J. 581, 170 A.2d 544 (1961).
This is the procedural context pertinent to Coastal's contention. Before the jury was brought into the courtroom to begin the first trial, Coastal's attorney stated there was "no question" that Mrs. Robbins "died as a result of the injuries sustained in the accident." However, he also stated that it "has candidly been admitted by [plaintiff's] counsel" that "there is not one single item of proof that exists or could be placed before this jury indicating that Mrs. Robbins suffered any conscious pain or endured any suffering at all," because, during discovery, no post-accident witness "has indicated any consciousness at all by Mrs. Robbins."
*26 Over plaintiff's objection, the judge dismissed plaintiff's damage claim "with respect to the pain and suffering," because there "needs to be conscious pain and suffering to be part of the ... damages that goes to the jury." According to the judge, "there is nothing in the medical reports or in the observations of doctors, nurses, emergency personnel, or any of those people that would suggest that there was conscious pain and suffering." For the same reason, the judge, over plaintiff's objection, dismissed plaintiff's damage claim "with respect to the hedonic damages," because "hedonic damages would have to be based on the victim's own loss of enjoyment and all those are simply not available." See Eyoma v. Falco, 247 N.J.Super. 435, 445, 589 A.2d 653 (App.Div.1991).
As noted, at the end of the first trial, the judge had entered a total judgment of $44,117 against Whitaker and Coastal. The judge also stated in the final judgment of September 5, 1996, after the second trial, that "all compensatory damages, including funeral and burial expenses, recovered by plaintiff in [the first] trial" were "recovered pursuant to the Wrongful Death Act, N.J.S.A. 2A:31-1 et seq." This was a reallocation of the initial judgment of May 30, 1995, after the first trial, when the judge had "molded the verdict as to funeral and burial expenses pursuant to the Survivor's Act, N.J.S.A. 2A:15-3 to include the sum of $3,939." Since 1969, funeral and burial expenses are recoverable and properly may be allocated to either the survival action, N.J.S.A. 2A:15-3,[1] or the wrongful death action, N.J.S.A. 2A:31-5[2].
At the motion hearing following the first trial, Coastal's attorney again observed that, at the beginning of the first trial, plaintiff's attorney had "candidly admitted before this court that he did not have one, single solitary witness who would come in here and say that Mrs. Robbins even for one second survived the accident," or "had any apprehension or fear or fright... of an impending death with a crash." Coastal asserted that there had been a "candid representation" by plaintiff that "there was not any evidence that he could present on a survivorship claim." Coastal argued that the "punitive damages aspect of the case must be dismissed as a matter of law," because "there are no punitive damages available under the Wrongful Death Act," and because "there has not been one dime, not one single dime recovered under the survivorship action."
In response, plaintiff argued that he had "never relied upon the Wrongful Death Act to establish a claim for punitive damages," but instead had "always relied upon the Survivor's Act," because "punitive damages would be compensable under the Survivor's Act." Plaintiff's counsel asserted that Coastal misunderstood plaintiff's concession at the first trial. Plaintiff's counsel asserted:
I never said that the survivor's cause of action was not being pursued. In fact, it was pleaded in every count.

* * * * * * Your Honor, I never conceded at any time that there wasn't a survivor's claim. What I conceded was that I couldn't produce evidence of conscious pain and suffering of the decedent. I never said that there was no claim under 2A:15-3. In fact, legally it stands alone. I disagree with counsel's assessment that you can't have punitive damages where no compensatory damages have been awarded [under the Survivor's Act]. I disagree with that *27 as a matter of law. They can be in this State.
In denying Coastal's motion to dismiss plaintiff's punitive damage claim, the judge said there was "no question that in this case, at least insofar as the proofs are concerned, the decedent died instantly and there was no proof to the contrary"; that is, "there simply was no proof of cognition that she was alive after the impact for any period of time." He explained that he had also dismissed plaintiff's "pain and suffering claim," because there was "no proof of "conscious pain and suffering," because Mrs. Robbins "died instantly... without any period of suffering." He explained that he had previously dismissed plaintiff's claim for "hedonic damages," because there was "no question" that Mrs. Robbins "died instantly."
While the judge considered Coastal's argument that "there ... must be at least a dollar's worth of compensatory [damages]" recovered under the Survivor's Act "to trigger punitive damages," he rejected this argument because the "punitive damage issue should have a stand-alone basis in a case such as this." Judge Forester explained: Punitive damages would have been a claim available to Mrs. Robbins had she survived. I believe it should not depend on whether or not she died instantly or whether or not she died after an anguishing death. To do so would place the following unusual circumstance that someone who was to do something outrageous and worthy of punitive damages, if the person was killed thereby, and killed instantly, there would be no claim for punitive damages. Whereas if they were less effective in their method and, consequently, the person lingered in the hospital for a year, then punitive damages would apply. I believe that that is not the intent of the Legislature and I don't believe that that was the intent of the decision in Kern [93 N.J.Super. 459, 226 A.2d 186 (Law Div.1967) ].

* * * * * *
[I]n a case where survivorship claims are made and not released and not abandoned, I do not believe that by granting the motion to dismiss the pain and suffering aspects of the case, ... that, therefore, the punitive damages ... under the 2A:15-3 rubric were likewise dismissed.

* * * * * *
For example, it is mentioned there ["in the punitive damage charge, 620"] that punitive damages may be awarded for wrongful conduct even if you have decided not to award compensatory damages citing Nappe v. Anschelewitz, 97 N.J. at page 50, 477 A.2d 1224.
On this appeal, Coastal argues that "New Jersey case law concerning punitive damages" requires "an award of compensatory damages as a predicate to punitive damages." We disagree. As the trial judge noted, in Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 477 A.2d 1224 (1984), a fraud action, the Supreme Court has ruled to the contrary:
Because of the fortuitous circumstance that an injured plaintiff failed to prove compensatory damages, the defendant should not be freed of responsibility for aggravated misconduct. People should not be able with impunity to trench wilfully upon a right.

[97 N.J. at 50, 477 A.2d 1224 (emphasis added).]

* * * * * *
We therefore hold that punitive damages may be assessed in an action for an intentional tort involving egregious conduct whether or not compensatory damages are awarded, at least where some injury, loss, or detriment to the plaintiff has occurred.

[Id. at 51, 477 A.2d 1224 (emphasis added).]

* * * * * *
[A] jury would need to find that the plaintiff suffered some harm as a result of his reliance on the defendant's fraudulent conduct, even if he were unable to prove that he was entitled to compensatory damages.

[Id. at 54, 477 A.2d 1224 (emphasis added).]
In Stella v. Dean Witter Reynolds, Inc., 241 N.J.Super. 55, 574 A.2d 468 (App.Div.), certif. denied, 122 N.J. 418, 419, 585 A.2d 412 *28 (1990) we ruled that the Supreme Court in Nappe meant exactly what it said:
In Nappe, ... the Supreme Court declared that "punitive damages may be assessed in an action for an intentional tort involving egregious conduct whether or not compensatory damages are awarded, at least where some injury, loss or detriment to the plaintiff has occurred." Id. at 51 [477 A.2d 1224] ... (emphasis added). The phrase, "at least," might be interpreted as leaving open the possibility that punitive damages may be available even if a claimant has not suffered "injury, loss, or detriment." However, the Court in Nappe expressly held that the trial judge was correct in instructing the jury that to justify an award of punitive damages, "a jury would need to find that the plaintiff suffered some harm as a result" of the defendant's intentional tort. Id. at 54 [477 A.2d 1224].... Our reading of Nappe requires us to hold that, although an award of compensatory damages is not a prerequisite to an award of punitive damages, Sykes cannot recover punitive damages against Midlantic... unless he suffered "some harm" as the result of its conduct.
[241 N.J.Super. at 69-70, 574 A.2d 468.]
Before the first trial began, Coastal made a "stipulation ... as to negligence and proximate cause." With regard "to who was responsible for the accident," Coastal said it was "acknowledging negligence, acknowledging responsibility for the occurrence of the accident." On appeal, Coastal concedes that the "nature of the stipulation was that Coastal was responsible for the occurrence of the accident," and Coastal does not dispute that the accident "caused the injuries which resulted in the death of plaintiff's decedent."
In this context, we cannot say that Mrs. Robbins suffered no harm from Coastal's conduct. The Supreme Court clearly held in Nappe that punitive damages may be awarded "whether or not compensatory damages are awarded," as long as "some injury, loss, or detriment to the plaintiff has occurred." 97 N.J. at 51, 477 A.2d 1224. We reject Coastal's contention that plaintiff could not recover punitive damages under the survivorship action, simply because "no compensatory damages [were] awarded under the survivorship action."
We also agree with the trial judge's conclusion that a claim for punitive damages "would have been ... available to Mrs. Robbins had she survived," and that this availability "should not depend on whether or not she died instantly." We question the judge's comments on how quickly Mrs. Robbins died. He said:
There is no question that in this case, at least insofar as the proofs are concerned, the decedent died instantly and there was no proof to the contrary.

* * * * * *
The ... court granted the motion to dismiss the pain and suffering portion of the case because there simply was no proof of cognition that she was alive after the impact for any period of time.
In the motion brief after the first trial, plaintiff actually had not conceded this:
The oil truck being driven by Whitaker continued into the intersection and struck the Robbins' vehicle on the left front side and continued traveling over and on top of Helen Robbins' vehicle, proceeding into a ditch on the southerly side of County Route 649.... The oil [truck] struck Helen Robbins' automobile with such force that it actually stretched the vehicle approximately ten feet and detached the engine and drive train assembly....
It is not known for what period of time Helen Robbins survived the impact, but Trooper Terruso testified that[,] when he first observed her, Helen Robbins didn't appear to be breathing and appeared to be unconscious....

* * * * * *
Clearly, during Helen Robbins' lifetime the defendants committed a tortious trespass upon her person. Each act or omission occurred prior to the January 4, 1990 accident and the tortious act was complete the moment Coastal's oil truck made impact with Helen Robbins' vehicle. That the defendant may claim the serendipity of complete and almost instant eradication of Helen Robbins' life does not vitiate the *29 reality of the tortious conduct, nor that it caused extreme fear to Helen Robbins upon the realization that the defendant's oil truck was overtopping her own vehicle.
N.J.S.A. 2A:15-3 provides that, in those actions based upon the wrongful act, neglect or default of another, "where death resulted from injuries for which the deceased would have had a cause of action if he had lived," the plaintiff's executors or administrators may recover "damages as their testator or intestate would have had if he was living."
In Kern, 93 N.J.Super. at 462, 469, 226 A.2d 186, the alleged tort was committed on March 9, 1964 and the decedent died, after suffering "severe pain and agony," on March 18, 1964. The Law Division judge noted that this factual situation implicated the following distinction between the Wrongful Death Act (N.J.S.A. 2A:31-1) and the Survivor's Act (N.J.S.A. 2A:15-3):
The [wrongful] death statute gives to the personal representatives a cause of action beyond that which the deceased would have had if he had survived, and based upon a different principle, a new right of action.

[93 N.J.Super. at 471, 226 A.2d 186.]
A very different legal problem is presented, however, by the act of 1855, now designated as N.J.S. 2A:15-3. In this act the law contemplates compensation to the deceased person's estate. It is in the interval between injury and death only that loss can accrue to the estate, and in that alone is the personal representative interested.... It is most significant ... that in this connection the limitation under the [wrongful death] act of 1848 runs from the death, and under the act of 1855 the limitation runs from the time of the injury inflicted until death.

[Id. at 472, 226 A.2d 186 (emphasis added).]
See Soden v. Trenton & Mercer County Traction Co., 101 N.J.L. 393, 399, 127 A. 558 (E. & A.1925) ("It is significant ... that the limitation under the act of 1848 runs from the death, while under the act of 1855 the limitation runs from the time of the injury inflicted.")
The Law Division judge in Kern also described how this distinction affected a claim for punitive damages under the Survivor's Act:
The question of permitting a claim for punitive damages under N.J.S. 2A:15-3... presents a problem of a different nature. It has been shown supra [93 N.J.Super. at 465-69, 226 A.2d 186] that punitive damages will not be permitted in an action brought under the Wrongful Death Act (N.J.S. 2A:31-1 et seq.) for the reason that such act is remedial in nature, and not penal. Claims for punitive damages for the wrongful death of a decedent have consequently been barred. Such claim, however, is to be distinguished from that portion of plaintiffs' claim which seeks punitive damages for the pain and suffering of decedent prior to her death, for the reason that this separate cause of action owes its existence not to the Wrongful Death Act, but rather to the survival action statute, designated as N.J.S. 2A:15-3.

[93 N.J.Super. at 474, 226 A.2d 186.]
The Law Division judge in Kern denied defendant's motion to dismiss plaintiffs' action "under N.J.S. 2A:15-3," which demanded "punitive damages for the pain and suffering of the deceased prior to her death." Id. at 475-76, 226 A.2d 186 (emphasis added). The judge explained why:
[T]he case of Messina v. Petroli, 11 N.J. Misc. 583, 585, 167 A. 767 (Circ.Ct.1933), would seem to support awards of punitive damages in actions brought under N.J.S. 2A:15-3. In Messina, supra, a writ of attachment was issued in favor of the administrator ad prosequendum of deceased, in an action in tort for personal injuries suffered between the time that the tort was committed and death. The Hudson County Circuit Court granted defendant's motion to set aside the writ of attachment, stating at page 587:
"* * * a general administrator, * * * would under the Executors and Administrators act of 1855, § 4 (2 Comp. St.1910, p. 2260) have the right to bring an action against the defendant for pain and suffering and the other losses recoverable * * *. In any event, an action for an *30 outrageous battery committed on the decedent to recover for pain and suffering, money losses and punitive damages should be brought in the name of the general administrator and not by an administrator with limited powers as the plaintiff in this case." (Emphasis added)
It can thus be seen, therefore, that the court in Messina, supra, set aside the writ of attachment not because a claim for punitive damages cannot be maintained where malice is alleged, but merely because the action was brought by the administrator ad prosequendum under the Wrongful Death Act, and not by the general administrator under the Executors and Administrators Act. Such reasoning would at least imply that an action brought by a general administrator under N.J.S. 2A:15-3 for punitive damages for pain and suffering of a decedent prior to his death, where malice is alleged, is actionable.

[Id. at 475, 226 A.2d 186.]
In Messina, 11 N.J. Misc. at 583-84, 167 A. 767, Concetta Messina was the decedent and her administrator ad prosequendum was Alfred Messina, her husband. In the affidavit upon which the writ of attachment was issued, Alfred Messina alleged the following: "While my wife was in the kitchen cooking supper, ... Giovanni Petroli did attack my wife and with a gun, shot her a number of times from which shots she instantly died." Id. at 583, 167 A. 767. The tort was committed upon the "attack" on Concetta Messina by Petroli, following which Petroli "shot her a number of times from which shots she instantly died." This is why the judge in Kern said that the tort action in Messina was for Concetta Messina's personal injuries suffered "between the time that the tort was committed and death." 93 N.J.Super. at 475, 226 A.2d 186.
In Alfone v. Sarno, 168 N.J.Super. 315, 403 A.2d 9 (App.Div.1979), modified on other grounds, 87 N.J. 99, 432 A.2d 857 (1981), we said:
The Wrongful Death Act is distinct from the so-called "survival action," N.J.S.A. 2A:15-3, which gives executors or administrators a right of action for tortious injury or damage to the deceased or his property incurred prior to death. N.J.S.A. 2A:15-3. In the usual case both actions are joined.

[168 N.J.Super. at 323, 403 A.2d 9 (emphasis added).]
See Alexander v. Whitman, 114 F.3d 1392, 1399 (3d Cir.), cert. denied, ___ U.S. ___, 118 S.Ct. 367, 139 L. Ed.2d 286 (1997) ("The major item of damages in a survival action [under N.J.S.A. 2A:15-3] (aside from funeral and burial expenses) is recovery of the decedent's pain and suffering between the time of injury and the time of death."); Foster v. Maldonado, 315 F.Supp. 1179, 1180 (D.N.J.), appeal denied, 433 F.2d 348 (3d. Cir.1970) ("Under the New Jersey Survival Act N.J.S.A. 2A:15-3, the damages recoverable are essentially for `pain and suffering' between the time of injury and death."). See also Tirrell v. Navistar Int'l, Inc., 248 N.J.Super. 390, 394, 407, 591 A.2d 643 (App. Div.), certif. denied, 126 N.J. 390, 599 A.2d 166 (1991) (We affirmed the jury award of "$50,000 on the survival action for decedent's pain and suffering" because, while decedent died "practically instantaneously after the truck had crushed his chest," the evidence revealed that "for some finite period the slowly-moving truck dragged decedent under its wheels" and the jury could infer that decedent had "some brief but distinct anticipation of his impending death as well as physical pain and suffering.").
As stated in Kern, 93 N.J.Super. at 475, 226 A.2d 186, in a survival action under N.J.S.A. 2A:15-3, the period "between the time that the tort was committed and death" is crucial. This is probably why Judge Dreier in Tirrell, 248 N.J.Super. at 407, 591 A.2d 643, was careful to say that the decedent there died "practically instantaneously" (i.e., that the decedent continued to live "for some finite period," albeit "brief," after the truck had crushed his chest).
The "concept of instantaneous death" is of interest here because some states, for example, "allow the survival only of torts not resulting in instantaneous death, requiring that instantaneous death torts be sued for under the wrongful death statute only." John P. Ludington, Annotation, When is Death "Instantaneous" for Purposes of Wrongful Death or Survival Actions, 75 *31 A.L.R.4th 151 § 2, at 155-56 (1990). A plaintiff is, therefore, perhaps well-advised to allege "a hiatus between the impact and the decedent's death," because some states, for example, "disallow punitive damages in cases of instantaneous death." Id. at 156-58.
Death rarely may be instantaneous in fact. This was discussed by the Michigan Supreme Court in Ford v. Maney's Estate, 251 Mich. 461, 232 N.W. 393 (1930):
In this state ... the Legislature did not intend to give two remedies for death by negligent act, but that the Death Act and the Survival Act are each exclusive within its sphere. The line of cleavage between them is whether the death is instantaneous. The legal test of instantaneous death was devised in order to afford a practical working of the statutes, death being seldom instantaneous in fact.

[232 N.W. at 394.]
The Michigan Supreme Court in Ford relied in part upon its earlier decision in Olivier v. Houghton County St. Ry. Co., 134 Mich. 367, 96 N.W. 434 (1903), where it said:
We see no reason for splitting hairs as to what is meant by instantaneous death, though we can appreciate the difference between a continuing injury resulting in drowning, or death by hanging, throwing from a housetop, etc., and one where a person survives the wrongful act in an injured condition.... See ... Kellow v. Iowa Cent. Ry. Co., 68 Iowa 470, 23 N.W. 740, 27 N.W. 466, ... where it was held that survival of the injury for a moment is sufficient to permit the cause of action to vest and survive.

[96 N.W. at 434-35 (emphasis added).]
See Kellow v. Central Iowa Ry. Co., 68 Iowa 470, 23 N.W. 740, 745 (1885), petition for reh'g denied, 68 Iowa 470, 27 N.W. 466 (1886) ("If the injury which caused the death is necessarily fatal, and death results in a few moments from it, it would no doubt be commonly called an instant death; but, as the person survived the injury for that brief period, it cannot be said that the death was instantaneous.").
Consider, for example, Justin v. Ketcham, 297 Mich. 592, 298 N.W. 294, 294-95 (1941), where the opposing counsel agreed that the subject decedent, Cecil Berersdorfer, had been an "occupant of said (Ford) car," and that "all of the occupants of the Ford car ... were killed instantly" in the "automobile collision." The record also indicated "that the collision was the cause of Berersdorfer's death, and that he died as a result of the collision without the intervention of any other causative factor." Id., 298 N.W. at 295. The Michigan Supreme Court observed that all this did not mean that Berersdorfer had been "killed instantly by the collision." Id. at 294-96. The Court explained why:
If the death of Berersdorfer was caused by, or was the result of, the collision, common sense compels the conclusion that both the cause of death and death itself did not occur in the same split second. The cause of death must come first, and the death must follow as a result. We reach the conclusion that the agreed statement that ... [Berersdorfer] was "killed instantly" means that death was instantaneous resulting from the collision. It does not mean that death was precisely coincidental with the impact.

[Id. at 295.]
The pertinent question in Justin was the existence of "an instant of time," even though no more than a "split second," between the "instant of the tort" and the "instant of death." Id. at 295-96. For example, if the decedent had "died in ... one-tenth of a second as a result of the tort," the instant of the tort and the instant of death "did not occur in the same split second." Ibid. While the Court in Justin could conceive of an automobile collision case where the death "might be precisely coincidental with ... [the] tort" (i.e., where the "precise split second... [of] death occurs `instantaneously' with the act of wrongdoing"), such was "not the case at bar." Ibid. Under N.J.S.A. 2A:15-3, the pertinent time period is also "between the time that the tort was committed and death." Kern, 93 N.J.Super. at 475, 226 A.2d 186.
Generally, the plaintiff (i.e., decedent's representative) "has the burden of proving that death was not instantaneous." 75 A.L.R.4th at 158-59. However, the plaintiff, in carrying *32 this burden, is favored by the "presumption of continuing life until the contrary is proved." Fretz v. Anderson, 5 Utah 2d 290, 300 P.2d 642, 649-50 (1956), modified on other grounds and petition for reh'g denied, 6 Utah 2d 169, 308 P.2d 948 (1957). This presumption was described in Fontenot v. Southern Farm Bureau Cas. Ins. Co., 304 So.2d 690 (La.Ct.App.1974), writ denied, 307 So.2d 640 (La.1975):
Our view is that where the time of death is uncertain, a legal presumption exists in favor of the continuation of life, until evidence is presented sufficient to establish that death occurred at some specific time or until a presumption of death established by law attaches.

[Id., 304 So.2d at 693.]
Citing to Fretz and quoting from Fontenot, our Supreme Court in Hake v. Manchester Township, 98 N.J. 302, 486 A.2d 836 (1985), commented upon the existence of "a presumption that life continues `until evidence is presented sufficient to establish that death occurred at some specific time.'" Id. at 312 n. 3, 486 A.2d 836. See Vreeland v. Vreeland, 78 N.J. Eq. 256, 259, 79 A. 336 (E. & A.1911) (noting that the "law presumes a continuation of life"). Accord DeSena v. Prudential Ins. Co. of Am., 117 N.J.Super. 235, 240, 284 A.2d 363 (App.Div.1971). See also Scharwenka v. Cryogenics Management, Inc., 163 N.J.Super. 16, 20, 394 A.2d 137 (App.Div.1978) (noting that, "while it is ordinarily presumed that a person alive at a given time continues to exist until his death is proved," a person's "death may be found as a fact from proof of circumstances overcoming the presumption"). See, e.g., Bowman v. Redding & Co., 449 F.2d 956, 961 (D.C.Cir.1971) (noting the "broadly applicable doctrine" that, "in cases where the time of death is uncertain, there is a presumption of continuance of life"); American Sugar Refining Co. v. Ned, 209 F.2d 636, 638 (5th Cir.1954) (noting the "presumption in favor of the continuation of life until the contrary is shown"). This presumption is deemed conclusive, unless rebutted. In the Interest of Coots v. Burton, 877 S.W.2d 245, 248 (Mo.Ct. App.1994) ("Life is conclusively presumed to continue until the contrary is shown by sufficient proof.").
While death rarely may be instantaneous in fact, instantaneous death can occur. As indicated in Sawyer v. Perry, 88 Me. 42, 33 A. 660 (1895), electrocution may be an example of instantaneous death in fact:
Very few injuries cause instantaneous death. "Instantaneous" means done or occurring in an instant, or without any perceptible duration of time, as the passage of electricity appears to be instantaneous. It is so defined in Webster's International Dictionary.

[Id., 33 A. at 661.]
Potomac Elec. Power Co. v. Smith, 79 Md.App. 591, 558 A.2d 768, cert. denied, 317 Md. 393, 564 A.2d 407 (1989), overruled on other grounds, United States v. Streidel, 329 Md. 533, 620 A.2d 905 (1993), involved the "electrocution of fifteen-year-old Chrissy Lambert by the force of an errant 7600 volt power line." Id., 558 A.2d at 771. Even accepting this as a case of "instantaneous death" in fact, the intermediate Maryland appellate court affirmed the "jury's award of punitive damages in the survivorship claim." Id. at 793. The Maryland court in Potomac Electric Power explained why:
Under the unique circumstances before us, there has been proof of an "actual loss" or a "showing of compensable injuries" although, aside from the award for funeral expenses, no compensatory damages were awarded in the survivorship action. In arguing that no punitive damages may be awarded, appellant shall not be permitted to rely on the fact that its reckless act instantaneously caused the death of the 15-year-old decedent. Because punitive damages are not recoverable under the wrongful death statute, see Cohen v. Rubin, 55 Md.App. 83, 101-02, 460 A.2d 1046 (1983), in cases of instantaneous death punitive damages would be precluded under appellant's theory. Such a result would thwart the policy of punitive damages "to punish the wrongdoer for misconduct and to deter future egregious conduct by others." Exxon Corp. v. Yarema, 69 Md.App. 124, 137, 516 A.2d 990 (1986), cert. denied, 309 Md. 47, 522 A.2d 392 *33 (1987). To establish a policy rewarding defendants otherwise liable for punitive damages for their expediency in causing an innocent person's death would be absurd. We refuse to do so, and we uphold the jury's award of punitive damages in the survivorship claim.

[Id., 558 A.2d at 793.]
While Potomac Electric Power apparently was not cited at the trial level, Judge Forester's ruling on the punitive-damage issue significantly reflects much the same reasoning because he said:
Punitive damages would have been a claim available to Mrs. Robbins had she survived. I believe it should not depend on whether or not she died instantly or whether or not she died after an anguishing death. To do so would place the following unusual circumstance that someone who were to do something outrageous and worthy of punitive damages, if the person was killed thereby, and killed instantly, there would be no claim for punitive damages. Whereas if they were less effective in their method and, consequently, the person lingered in the hospital for a year, then punitive damages would apply. I believe that that is not the intent of the Legislature and I don't believe that that was the intent of the decision in Kern.

The judge may have somewhat over-credited the evidence when he said that, "at least insofar as the proofs are concerned," there was "no question" that Mrs. Robbins "died instantly." Granted, there was "no proof to the contrary," in that there was "no proof... that she was alive after the impact for any period of time." However, giving plaintiff the benefit of the presumption that life continues until the contrary is shown, the judge might have assumed that Mrs. Robbins was alive for a period of time, albeit brief, after the impact between Coastal's oil truck and her automobile. But in any event, we conclude that plaintiff's survivorship claim for punitive damages was legally valid.
While the factual underpinnings of the judge's conclusion may have been somewhat theoretical, we think his legal conclusion was sound: "Punitive damages would have been a claim available to Mrs. Robbins had she survived. I believe it should not depend on whether or not she died instantly or whether or not she died after an anguishing death."
We reject Coastal's casuistic or metaphysical argument that as a matter of law, plaintiff cannot recover punitive damages under the survival action. Plaintiff's decedent clearly suffered "some injury" and "some harm" from Coastal's conduct, the predicate for a free-standing award of punitive damages (without compensatory damages) under Nappe v. Anschelewitz, 97 N.J. at 51, 54, 477 A.2d 1224. We also cannot overlook the reality that reallocation of the burial and funeral expenses nunc pro tunc to the survivor's action or even an implied verdict for nominal damages of six cents ($.06) could supply the necessary underlying procedural predicate for the award. "Because of the fortuitous circumstance that an injured plaintiff failed to prove compensatory damages, the defendant should not be freed of responsibility for aggravated misconduct." Id. at 50, 477 A.2d 1224.

VII
Coastal next contends that the punitive damage award in the survival action must be set aside because its alleged conduct "did not rise to a level required for consideration for imposing punitive damages." We disagree. Coastal relies heavily upon M.G. v. J.C., 254 N.J.Super. 470, 603 A.2d 990 (Ch.Div.1991), where the trial judge held that "[t]o warrant a punitive damage award there must be an evil minded act accompanied by a wilful and wanton disregard of the rights of others." Id. at 480, 603 A.2d 990 (emphasis supplied).
In M.G., the Chancery Division judge said:
To warrant the punitive damage award there must be an evil minded act accompanied by a wilful and wanton disregard of the rights of others. Nappe v. Anschelewitz et al., 97 N.J. 37, 48, 477 A.2d 1224[sic], 97 N.J. 37, 477 A.2d 1224 (1984).

[Id. at 480, 603 A.2d 990 (emphasis added).]
However, this is not the standard set out in Nappe, 97 N.J. 37, 477 A.2d 1224, where the Supreme Court said:

*34 To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an "evil-minded act" or an act accompanied by a wanton and wilful disregard of the rights of another. Di Giovanni v. Pessel, supra, 55 N.J. at 191 [260 A.2d 510].

[Id. at 49, 477 A.2d 1224 (emphasis added).]
In Di Giovanni v. Pessel, 55 N.J. 188, 260 A.2d 510 (1970), the Supreme Court said:
An act to give rise to punitive damages must be actuated by
"(1) actual malice, which is nothing more or less than intentional wrongdoing___ an evil-minded act; or (2) an act accompanied by a wanton and wilful disregard of the rights of another. Clearly, each case must be governed by its own peculiar facts." La Bruno v. Lawrence, 64 N.J.Super. 570, 575 [166 A.2d 822] (App. Div.1960), certif. denied, 34 N.J. 323 [168 A.2d 694] (1961).
[Id. at 191, 260 A.2d 510 (emphasis added).]
The correct standard is the one set forth in Di Giovanni and Nappe. See Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610, 691 A.2d 350 (1997).
Plaintiff did not allege that Coastal "knowingly permitted its vehicle to be operated with defective or deficient braking systems." But such an allegation would only implicate one of the two factors, either of which must be found before punitive damages can be awarded. La Bruno, 64 N.J.Super. at 575, 166 A.2d 822. This would be "an intentional wrongdoing in the sense of an `evil-minded act.'" Nappe, 97 N.J. at 49, 477 A.2d 1224. However, such an allegation does not eliminate the second, alternative factor, which would be "an act accompanied by a wanton and wilful disregard of the rights of another." Ibid. The second factor's "requirement of willfulness or wantonness" may be satisfied by proof of a "deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." Berg v. Reaction Motors Div., 37 N.J. 396, 414, 181 A.2d 487 (1962). Accord Nappe, 97 N.J. at 49, 477 A.2d 1224; Di Giovanni, 55 N.J. at 191, 260 A.2d 510.
Plaintiff presented substantial proof to the jury to satisfy the high standard required for a claim of wilful and wanton conduct creating a high degree of probability of harm and reckless indifference to the consequences. The 36,000 pound straight-body oil truck was operated by a completely inexperienced and virtually untrained driver, who knew nothing about how to adjust air brakes or how the complex braking system on this oil truck actually worked.
The truck, a used 1974 Ford, had been purchased by Coastal in October 1989 and Whitaker, an inexperienced oil truck driver, was hired to operate this vehicle. Whitaker had no experience with heavy equipment; he had never operated anything larger than a pick-up truck before employed by Coastal. He never claimed he knew how to drive a large oil truck. Whitaker testified that he knew nothing about adjusting the brakes. The oil truck was equipped with air brakes and Whitaker stated that "after a while" he knew that the brakes needed adjustment. Whitaker said that he had never been given the Federal Motor Carrier Safety Regulations. He had no commercial driver's license nor did he ever obtain the commercial driver's manual issued by the State of New Jersey. He was never sent to school for any training.
This oil truck had a front-brake limiting valve which operated to reduce its front braking power on wet surfaces. When activated, it prevented the front brakes from engaging. However, Whitaker knew nothing about that device or how it worked.
The air brakes on this truck required brake adjustments regularly and systematically. The Federal Motor Carrier Safety Regulations mandated regular maintenance. Pre-trip inspections were required. Whitaker stated that he only knew how to step on the brakes to check them. He knew nothing about how to adjust them. Specific pre-trip braking tests were never explained to him.
Whitaker also said that he was required to fill out driver's daily logs or pre-trip inspection reports. He said he was required to *35 check off the items he inspected, but he did not know how to check the brakes. The driver's daily logs revealed that there were a number of problems with this vehicle during the two-week period before the date of Mrs. Robbins' January 4, 1990 fatal accident with this truck. Whitaker kept noting electrical problems. Fuses kept blowing, and as a result, turn signals, brake lamps and stop lights would malfunction. In addition, a blown fuse would cause the low-brake airwarning buzzer to malfunction. Whitaker testified that he had no knowledge about how to maintain the truck, and on the date of this accident, the manager, John Sorenson, did not check the brakes. Whitaker could not tell whether the brakes were in good working order except by using them.
Whitaker recorded this truck as being in good working order on December 15, 1989. However, there were numerous violations found on that day by Trooper John Herman when the State Police pulled the truck over for inspection. The vehicle was declared outof-service or "redlined" for having no operating low-air warning device, no rear brake lamps, no windshield wipers, no emergency marking kit, a broken right vent window, and no legible description of a haz/mat warning. The brake lamps and low-air warning device were "out of service conditions." Trooper Herman testified that he was not aware that Coastal had ever certified that any repairs were completed after December 15, 1989, though required to do so. On December 15, 1989, however, Trooper Herman never actually inspected the brake adjustments. He did, however, testify that repeated usage of air brakes causes them to go out of adjustment and that regular maintenance and adjustments were critical.
Before the accident, Whitaker had informed management at Coastal's Vineland, New Jersey facility that there were problems with these brakes. He did not know if the brakes had ever been adjusted, and he stated that the brakes felt "weak" at and before the time of the accident. Again, Whitaker was not trained on what to look for or to do if brakes felt weak and needed adjustment.
Between the time of the December 15, 1989 State Police stop and the time of this accident, there is no indication that repairs were made. Rather, evidence suggested Coastal knowingly and deliberately operated the vehicle "out of service" for several weeks. The driver's daily logs reveal the same electrical problems that caused this vehicle to be declared "out of service" on December 15, 1989 continued to exist during the two-week period prior to this accident. The only record of repair was a January 2, 1990 invoice from a company known as "Met'l Worx." A representative from Met'l Worx testified the repairs were done on January 2, 1990. However, these same problems were found after the January 4, 1990 accident involving Mrs. Robbins. These conditions were outlined by Trooper Manuel Gordillo and Trooper Herman as described in the North American Out-of-Service Criteria. Under North American criteria, a vehicle is deemed unsafe to operate if declared out-of-service. The North American Out-of-Service Criteria indicate that the rear brakes on a vehicle like the one involved in this accident were required to be within adjustment. One rear brake with an adjustment limit of 2 1/4" renders the vehicle out-of-service. At the time of this accident, both rear brakes were at 2 1/4". Either of the rear brakes would have rendered this vehicle unsafe to drive.
As Whitaker approached the intersection, before the accident, he testified that his brakes were not working properly. He was going about 35 to 45 m.p.h. At no time before the impact was he able to lock his brakes. He said that he observed Mrs. Robbins' vehicle traveling northbound after he realized that his brakes did not work. He said he saw Mrs. Robbins' vehicle perhaps five seconds before impact. In fact, Whitaker testified that he was standing on the brakes in an effort to make the vehicle stop but was unsuccessful. Trooper Mario Terruso testified that Whitaker told him at the scene that he could not stop the vehicle. Whitaker's truck overtopped Mrs. Robbins' vehicle and literally tore the engine away from the Lincoln Town Car, causing it to "stretch out."
Whitaker was questioned as to whether he knew how to perform a pre-trip inspection of the brakes to make sure they worked properly. *36 He was questioned by reference to the New Jersey Commercial Driver's Manual testing procedures. He said that he did not know how to perform that test. He also did not know what service criteria rendered the vehicle out-of-service.
In addition to Whitaker's own statements that he was unable to stop the vehicle, there was testimony from Trooper Manuel Gordillo and two experts produced by the plaintiff, Graham Thompson and John Cheruka, that the rear brakes on this truck were not operational and provided no braking power. Trooper Gordillo testified that a size 30 clamp-type chamber, as on this 1974 Ford, with rear brake adjustments at 2 1/4" will not permit the brakes to hold. He said that you will "not have any brakes." Graham Thompson, a mechanical engineer, noted that with the rear brakes at 2 1/4" of adjustment, the rear wheels still were moving with the spring brakes activated. The spring brakes, also known as "maxis," were the emergency brakes designed to lock the rear brakes in the event of an emergency. Thompson said these are on the same system that operate the rear brakes of the vehicle. Thompson said that they were "totally defective." Thompson also stated that within a reasonable degree of engineering probability, the stopping power of this truck had been reduced between 92% and 95% at the time of the accident.
Plaintiff's safety expert, John Cheruka, testified as to the brakes and indicated that 70% to 80% of the stopping ability of the truck was performed by the rear brakes. He also stated that the rear brakes were "way out of adjustment."
Coastal was unable to produce any evidence of regular, systematic adjustments to the brakes as required by the Federal Motor Vehicle Safety Regulations. The only evidence of brake adjustments was nearly two months before this accident. There was no evidence the brakes had ever been adjusted after that date. This was the only maintenance record that Coastal was able to produce with the exception of the January 2 invoice from Met'l Worx which allegedly repaired the non-braking problems which put the vehicle out-of-service on December 15, 1989.
Plaintiff's experts also severely criticized the safety program at Coastal. John Cheruka testified that Coastal had "one of the worst maintenance programs [he had] seen." Coastal failed to notify the Department of Transportation of a fatal accident, failed to file a fatal accident report, and failed to conduct a required investigation as to the cause of the accident. John Cheruka testified that daily inspections of these air brakes were required and he found that this vehicle had been driven with out-of-service violations following the December 15, 1989 stop. Cheruka also testified that Coastal's own personnel, McCourt and Sorenson, who were responsible for safety, did not even know how to conduct proper daily brake inspections. He found no maintenance program in existence and no record to confirm such a program's existence.
Graham Thompson, the mechanical engineer, said that based upon the amount of time the driver described between first seeing Mrs. Robbins' vehicle and the impact, within a reasonable degree of engineering certainty, the absence of rear braking on the vehicle caused the accident. In contrast, Coastal produced no expert testimony and simply argued that an "accident reconstructionist" was required, notwithstanding Coastal's stipulation or admission of both negligence and proximate cause.
Coastal also attempted to elicit evidence through Thompson, plaintiff's expert, that a state trooper from the fatal accident unit, Trooper Lombardo, thought that inattentiveness may have played a role in the accident. Lombardo, however, was not called to testify and he never performed an accident reconstruction. In response to questions, which were allowed over objection with respect to driver inattention and the fact that the brakes on the truck did not lock, Thompson testified that "the brakes were so inoperative that the vehicle would not even veer to one side or the other." In addition, Thompson testified that Whitaker was applying his brakes at least 500 feet in front of the intersection and that Whitaker conceded he saw the other vehicle five seconds before impact.
*37 Coastal tried to adduce testimony that it inspected the vehicle after the accident and found nothing wrong. Coastal attempted to have John Sorenson testify that these brakes were in proper working order at the time of the accident. Sorenson actually could not recall when he had done such an inspection. In fact, Sorenson was confronted with the Met'l Worx invoice that indicated the brakes had been adjusted before the truck was returned to Coastal. Sorenson conceded that he had no way of knowing whether or not he inspected the brakes on the vehicle before or after it came back from Met'l Worx. Sorenson also conceded this truck had various problems with the electrical system and brake warnings, lights, brake lamps, turn signals, and other items which would not function from time to time. The jury was provided with records that showed this vehicle was operated continually for over a two-week period with such problems. Plaintiff contended these problems were safety hazards and out-of-service conditions, pursuant to the State Police guidelines.
Plaintiff also examined John McCourt, Coastal's transportation manager, who ultimately was responsible for safety. McCourt's testimony revealed that Coastal had essentially no maintenance program at the Vineland facility, and there were no record-keeping procedures. McCourt testified that terminal managers such as Bruce Arnold, the Vineland facility manager, did have maintenance experience. However, he conceded that Arnold never received any such training and had no idea how to keep proper maintenance records. Arnold testified he had no maintenance experience because he was a "marketing person." McCourt had no knowledge as to fatal accident reporting requirements and had never checked whether or not a fatal accident report was filed. McCourt was not familiar with the North American Out-of-Service Criteria and was unaware of the fact that, if the rear brakes on a size 30 clamp chamber were beyond 2" in adjustment, the vehicle was unsafe to operate. He could not say that John Sorenson had any idea how to do a pre-trip inspection of brakes. As to record-keeping with respect to maintenance, which was required pursuant to federal regulations, McCourt simply said that "we have never done it." He admitted that there were no records of any brake adjustments after November 14, 1989 and no written policy to ensure that regular and systematic brake adjustments occurred. McCourt testified that no changes were made after the accident and record-keeping procedures had not changed up until the time of trial. McCourt also conceded there were no policies in effect at Coastal to monitor vehicles that had been taken out-of-service by State Police. He stated that he never checked to see if repairs were done to this 1974 Ford after it was taken out-of-service by State Police on December 15, 1989. He confirmed that he had no idea how many miles were being put on this truck and conceded that the odometer on the vehicle was broken. McCourt did, however, confirm that the brakes should have been adjusted at least every 1,000 miles but he never conducted any training sessions with drivers or employees to tell them that. In addition, there was no training program or budget set aside to train drivers with respect to the Federal Motor Carrier Safety Code Regulations and no written testing in place. McCourt stated that he was satisfied Whitaker knew how to adjust the brakes to make sure they were working properly and that their safety and record-keeping procedures were sufficient. He said he would be comfortable handling the program today the same as was done back in 1989. McCourt also conceded that he did not even know what the maximum allowable slack adjustment was on this type of vehicle during his 1992 deposition and that he checked on this before testifying at trial.
Coastal also had been asked in discovery to provide post-accident information with respect to out-of-service conditions regarding vehicles. Plaintiff finally was able to retrieve Federal Department of Transportation records showing that between July 22, 1994 and July 21, 1996 nineteen stops of Coastal vehicles took place, and 50% to 55% of them had been taken out of service due to safety violations. Five of the nineteen violations were for out-of-adjustment brakes.
The picture portrayed to the jury of total brake failure on this oil truck, due to lack of attention to maintenance procedures and *38 poor supervision, was sufficient, if believed by the jury, to justify punitive damages. The jury reasonably could have found under this evidence a wilful and wanton disregard of public safety, rising to the level of reckless indifference.

VIII
Coastal contends the judge erred by permitting the jury to consider improper financial information in deciding punitive damages. In 1995 Coastal's assets were valued at about $37.6 million. In 1993 Coastal's assets were valued at about $351.6 million. This difference primarily was created when Coastal transferred a substantial part of its assets to Coastal Refining and Marketing, Inc. (Coastal Refining), a separate legal entity, at the end of 1993, purportedly for sound business reasons unrelated to this case.
Coastal contends that the judge erred in allowing the jury to "consider the prior value... of defendant Coastal," because this violated the dictates of Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 627 A.2d 1081 (1993), in which the Supreme Court set forth the considerations a jury may undertake in determining an appropriate award of punitive damages. Coastal asserts that its prior value was "no longer an appropriate consideration" in 1996, especially because "at the time of the trial in July of 1996," Coastal, "while still a substantial company having assets of Thirty (30) Million Dollars at the time of trial, did not have the same assets as in 1990."
In Herman, the Supreme Court said the jury, for purposes of awarding punitive damages, could consider "evidence of defendant's financial condition." Id. at 343, 627 A.2d 1081. For purposes of punitive damages, "punishment and deterrence," the Court concluded that defendant's "financial condition" roughly meant defendant's "ability to pay." Id. at 345, 627 A.2d 1081. Any "indicia" of defendant's financial condition presumptively could be an "indicator" of defendant's ability to pay. Id. at 345-46, 627 A.2d 1081. See generally Leimgruber v. Claridge Assoc., Ltd., 73 N.J. 450, 456, 458-59, 375 A.2d 652 (1977) (stating that the "wealth of the perpetrator" is among the "considerations which normally enter into a punitive damage assessment," the Court concluded that the amount of punitive damages should vary with the "wrongdoer's financial circumstances" and "ability to pay," so that "very wealthy offenders would be charged with higher damages"); Weiss v. Weiss, 95 N.J.L. 125, 127, 112 A. 184 (E. & A.1920) (noting that the "mode of proving the wealth of the defendant" for purposes of punitive damages should "relate to ... his actual pecuniary ability"); Flaacke v. Stratford, 72 N.J.L. 487, 488, 64 A. 146 (E. & A.1906) (noting that, "on the question of punitive damages," it is "obviously proper that the wealth of the defendant should be considered, because an award which would practically bankrupt a poor man would be but light punishment as against a man of considerable wealth"); Belinski v. Goodman, 139 N.J.Super. 351, 357, 354 A.2d 92 (App.Div.1976) (noting that the "actual wealth of a defendant is relevant on a claim of punitive damages"); Gierman v. Toman, 77 N.J.Super. 18, 20, 185 A.2d 241 (Law Div.1962) (noting that the "injured party may establish ... the actual pecuniary ability of the defendant as bearing upon the subject of punitive damages").
Coastal would confine the evidence of its financial condition to "its assets and net worth at the time of the trial in July of 1996" and would have withheld from the jury information that, "at the end of 1993," Coastal had transferred about 90% of its assets to Coastal Refining. Under Coastal's proposal, the jury would have known that "Coastal's assets at the time of the 1996 trial were approximately 37.6 million dollars," but would not have known that "Coastal's assets ... in 1993 were $351,550,000," or what "accounted for the difference in the size of the corporation" between 1993 and 1996.
If Coastal is correct, this implies that a corporate defendant could avoid the imposition of a large punitive damage award simply by transferring the bulk of its assets to a sister or standby corporation before trial, transforming itself from a wealthy defendant with the ability to pay a large punitive damage award into a poorer defendant perhaps without the ability to pay such an award. Coastal's proposal is not consistent with the *39 Supreme Court's approval in Herman of the use of any helpful or relevant "indicia" or "indicator" of the defendant's ability to pay the punitive damage award. 133 N.J. at 345-46, 627 A.2d 1081.
Coastal also contends that the judge erred in allowing the jury to know the value of a corporation which was not the subject of this litigation, Coastal Refining, a "completely separate corporate entity" which was not the "corporate entity on trial." Of course, as even Coastal acknowledges, the evidence actually before the jury was that Coastal Refining acquired the assets of Coastal at the end of 1993, which accounted for the difference in the size between 1993, when Coastal had assets of about $351.6 million, and 1996, when Coastal had assets of only about $37.6 million.
We are satisfied the issue was handled properly by Judge Forester. He allowed the jury to evaluate the entire financial situation. Moreover, the verdict's size does not suggest any abuse of the financial information in the circumstance.

IX
Coastal claims the punitive damage award of $1.25 million was totally inappropriate or clearly excessive, the result of misunderstanding or passion and prejudice. Coastal stresses that the Legislature "recently passed N.J.S.A. 2A:15-5.14," which caps punitive damage awards in most civil actions at "$350,000 or five times compensatory, whichever is the greater amount." See N.J.S.A. 2A:15-5.14(b). "Since the punitive damage award herein was ... not in accordance with [this] recently passed legislation," Coastal asserts that we "should vacate the award and at minimum order a new trial."
The Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17, was enacted on June 29, 1995 and "shall take effect 120 days after enactment and shall apply to causes of action filed on or after the effective date of this act." L. 1995, c. 142, § 11. Plaintiff's complaint was filed on June 8, 1990. The Punitive Damages Act is not applicable.
Coastal also contends the punitive damage award of $1.25 million is "clearly excessive" because it bears "no reasonable relationship to the compensatory award in this case of $40,178." Because of this claimed asymmetry, Coastal asserts that we "should vacate the award and at minimum order a new trial."
In Nappe, 97 N.J. 37, 477 A.2d 1224, the Supreme Court held that "where some injury, loss, or detriment to the plaintiff has occurred," punitive damages may be awarded "whether or not compensatory damages are awarded" (i.e., "in the absence of compensatory damages"). Id. at 51, 477 A.2d 1224. Accord Stella, 241 N.J.Super. at 69-70, 574 A.2d 468. The Supreme Court "does not call for a fixed ratio between compensatory and punitive damages awarded" and instead adheres to the general doctrine that the "amount of punitive damages ... awarded must bear some reasonable relation to the injury inflicted and the cause of the injury." Leimgruber, 73 N.J. at 457, 375 A.2d 652. This also is why an "appellate court is always free to determine that the punitive award is excessive, based on factors in addition to the scope of compensatory damage ..., such as the comparative seriousness of the misconduct and the wealth of the malefactor." Id. at 459, 375 A.2d 652.
Finally, there is no "specific ratio between compensatory and punitive damages," because punitive damages are "assessed from the perspective of the defendant rather than of the plaintiff." M.G., 254 N.J.Super. at 480, 603 A.2d 990. Accord Scott v. Scott, 277 N.J.Super. 601, 615, 649 A.2d 1372 (Ch.Div.1994). Punitive damages are "not awarded to compensate a plaintiff, but rather to punish a wrongdoer"; a punitive damage award is the "punishment ... for the act" of the defendant, "not the consequences thereof." Cappiello v. Ragen Precision Indus., Inc., 192 N.J.Super. 523, 532-33, 471 A.2d 432 (App.Div.1984).
Damage awards by a jury, whether compensatory or punitive, "should be upset for being excessive only in clear cases." Leimgruber, 73 N.J. at 459, 375 A.2d 652. In Allen v. Craig, 13 N.J.L. 294 (Sup.Ct. 1833), the former Supreme Court held that "when a jury gives exemplary damages," a *40 court "has no graduated scale by which to measure them, and its general and safest rule, is not to interfere, unless they are manifestly outrageous." Id. at 301. In Leimgruber, this court had reduced the punitive damage award from $16,500 to $5,000, "on the basis of its finding that the trial court's award was `clearly excessive.'" 73 N.J. at 453, 375 A.2d 652. The Supreme Court reversed our ruling and reinstated the $16,500 punitive damage award. Id. at 453, 461, 375 A.2d 652. The Supreme Court explained: "Absent a finding that the quantum of such damages was `manifestly outrageous' (Allen v. Craig, supra) it should have refrained ... from disturbing that part of the trial court judgment." Id. at 461, 375 A.2d 652. We do not find the $1.25 million award manifestly outrageous in the circumstance.

X
We find the balance of Coastal's contentions: (1) denial of motion to bar plaintiff's experts or reject their testimony, (2) denial of Coastal's recusal motion, and (3) admission in evidence of the Federal Highway Administration Carrier Profile, and the points raised on the cross-appeal, clearly without merit. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] N.J.S.A. 2A:15-3 states:

Executors and administrators may have an action for any trespass done to the person or property, real or personal, of their testator or intestate against the trespasser, and recover their damages as their testator or intestate would have had if he was living.
In those actions based upon the wrongful act, neglect, or default of another, where death resulted from injuries for which the deceased would have had a cause of action if he had lived, the executor or administrator may recover all reasonable funeral and burial expenses in addition to damages accrued during the lifetime of the deceased.
[2] N.J.S.A. 2A:31-5 states:

In every action brought under the provisions of this chapter the jury may give such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death, together with the hospital, medical and funeral expenses incurred for the deceased, to the persons entitled to any intestate personal property of the decedent.